### In re MORTGAGE INVESTORS CORPORATION, Debtor.

Bankruptcy No. 91–16020–WCH.

United States Bankruptcy Court,
D. Massachusetts, E.D.

Jan. 14, 1992.

Memorandum on Motion for
Reconsideration Feb. 3, 1992.

Christopher Katucki, Good, Procter & Hoar, Boston, Mass., for Goodwin, Procter & Hoar.

James Lightman, Goldstein & Manello, Boston, Mass., for debtor.

Francesca Morant, Choate, Hall & Stewart, Boston, Mass., for Senior Lenders.

OPINION REGARDING STRATFORD MANAGEMENT ASSOCIATES' MOTION TO COMPEL DISBURSEMENT OF INSURANCE PROCEEDS AND RELATED MATTERS

WILLIAM C. HILLMAN, Bankruptcy Judge.

This matter was heard on October 11 and November 7, 1991, upon the motion of Stratford Management Associates Realty Trust ("Stratford") seeking to have certain insurance proceeds disbursed by the debtor ("MIC"). Also involved is the claim of Goodwin, Procter & Hoar ("GP & H") to a portion of the proceeds as will be hereinafter discussed.

### FINDINGS OF FACT

1. In 1986, Stratford's predecessor, a partnership named "Stratford Management Associates" ("the partnership") was a real estate investor and MIC a lender.

2. Prior to July 21, 1986 Stratford had borrowed $300,000 from MIC.

3. On July 21, 1986 the partnership and MIC entered into a "Collateral Pool Line of Credit and Security Agreement" ("the Agreement") whereby MIC agreed to provide up to $5,000,000 in credit for use in the acquisition and renovation of real estate by the partnership. The advances would be individually approved, secured by various properties of Stratford, and cross-collateralized and cross-defaulted.

4. The Agreement called for certain fees and interest to be paid by Stratford [1]

1. It would appear that the so-called "Lynn Properties" were conveyed by the partnership to Stratford, subject to MIC's mortgages. All parties seem to regard the two Stratford entities as

including "minimum interest" described as follows:

14. *Minimum Interest.* No later than the expiration of the Term, or, if later, the latest maturity date of any advance made by the Lender pursuant to this Agreement, the Borrower shall pay to the Lender minimum interest ("Minimum Interest") under this Agreement, excluding any points, Origination Fee, Second Origination Fee or Additional Origination Fee, equal to twelve (12) months of interest on the principal balance of Two Million Five Hundred Thousand Dollars ($2,500,000) at the rate provided in Subparagraph 4(b)(1) of this Agreement. At such time as the Borrower pays the Twenty–Five Thousand Dollar ($25,000.00) Second Origination Fee as proved [sic] in Section 12 of this Agreement, the minimum interest under this Agreement shall be equal to Twelve (12) months of interest payments on the principal balance of Five Million Dollars ($5,000,000.00) at the rate of interest set forth above. *All interest paid by the Borrower to the Lender hereunder subsequent to the execution of this Agreement shall be credited toward Minimum Interest.* The obligation of the Borrower to the Lender for the payment of Minimum Interest is unconditional and shall be payable regardless of any termination of this Agreement and regardless of the amount of advances made pursuant to this Agreement. (Emphasis added).

5. The uncontroverted testimony is that, notwithstanding the "all interest" language quoted, interest paid on the loan which predated the Agreement would not be credited against Minimum Interest.

6. On June 12, 1989, the Agreement was amended ("the Amendment"). It is specifically noted that the amount of minimum interest due MIC at that time was $193,492. Of that amount, $150,000 was broken off as the subject of a separate note designed as the "Collateral Pool Interest Note" ("the Pool Note"). A "New Note" for $300,000 was made to Stratford, seemingly as a replacement for the earliest pre-Agreement note.

7. The Amendment contains the following further provisions:

A. The principal of the Pool Note "shall be reduced automatically by the amount of

one for purposes of this hearing, and the Court will describe them as "Stratford" without distinction hereafter.

interest paid by Borrower on the New Note."

B. "The balance of the outstanding Minimum Interest will continue to be secured by mortgages granted by [Stratford] to [MIC] pursuant to the [Agreement]."

C. "All of the other terms for Minimum Interest shall be the same as set forth in the [Agreement]."

8. It is not clear from the language of the Amendment whether subsequent interest, including that paid on the New Note, could be credited other than to the Pool Note. MIC's witness testified that New Note interest would be credited against the Pool Note only. Stratford's witness implied the opposite. Notwithstanding the controverted testimony, the fact that non-varied provisions of the Agreement were specifically stated to remain in force leads to Court to conclude that any interest payments made after the Amendment on the New Note, or "the Chelsea Note" (the only note outstanding under the Agreement), would be credited against minimum interest payable in some respect, whether represented by the Pool Note or not.

9. On December 14, 1990, MIC made demand upon Stratford for payment in full of the $300,000 balance on the New Note; the Pool Note (which was now stated to have a balance of $45,713.89); and the Chelsea Note, which had a principal balance of $175,000. Certain minor "other charge" items were also sought.

"Demand is hereby made for the entire $533,065.02," continues the letter. That sum consisted of the principal of the three notes, aggregating $520,713.89, and "other charges" of $6,499.67 on the New Note and $5,852.46 on the Chelsea Note. No claim is made for any other amount.

10. A fire later in that same month destroyed one of the Lynn properties, resulting in the payment by the insurers of approximately $2,000,000. Stratford began negotiations with its first mortgagee and MIC, the second mortgagee, regarding the use of the proceeds. The negotiations with MIC culminated in a letter agreement of May 6, 1991 ("the Letter Agreement") between MIC and Stratford.

11. The Letter Agreement recites that [MIC] initiated two loans (the "Loans") to [Stratford] which remain outstanding. The principal amount of $100,167.47 remains outstanding under the first of those two loans and is secured by first mortgages of Units 103 and 202 of Washington Avenue Schoolhouse Condominium in Chelsea, Massachusetts (the "Chelsea Condominiums"). The second of these two loans, which has an outstanding principal balance of $300,000, is secured by a junior mortgage (the "Lynn Mortgage") of numerous properties in Lynn, Massachusetts (the "Lynn Property").

There is no mention of the Pool Note. The principal officers of Stratford explain this in their testimony: As part of the negotiations, MIC, through its vice president, Mr. Mee, agreed to waive any balance of minimum interest. Mr. Mee specifically denies the allegation. The Court finds that Stratford has failed to satisfy its burden of proof on the issue.

12. There is no mention of legal fees in the Letter Agreement. There is no evidence that they were intended to be waived. The absence of any evidence requires a finding that they were not waived.

13. A second fire occurred in May, 1991, and it is with a portion of the proceeds of the insurance payment relating to that incident that the present dispute is involved.

14. At the hearing of October 11, 1991, the Court ordered certain agreed amounts paid from the fund into escrow for MIC or the Senior Lenders, as subsequently appears. A balance of $550,000 was directed to be held by the trustee awaiting this ruling for the following purposes:

A. $100,167.47 and $291,550.62, the note balances remaining outstanding, pending determination of the right thereto between the trustee and the Senior Lenders;

B. $102,002.00 as against minimum interest as determined by the Court (reduced by subsequent order of the Court to $58,-508.74);

C. $38,553.42 toward any fees awarded to GP & H; and

D. $19,298.70 against any fees of the trustee's counsel in these proceedings.

The remaining issues which the Court must determine are the amount, if any, remaining due to MIC for minimum interest; and the amount, if any, due from Stratford to GP & H, MIC's bankruptcy trustee, or the Senior Lenders for legal fees regarding these transactions, under the loan documents or otherwise.

### DISCUSSION AND CONCLUSIONS OF LAW
*The Minimum Interest issue*

The starting point must be the June 12, 1989 Amendment. In it, all parties agree

that the minimum interest then due was $193,492. The Pool Note represented $150,000 of that sum, with $43,492 remaining under the Agreement ("the Agreement Balance").

When MIC made demand for payment in full on December 14, 1990, it set the amount due on the Pool Note at $45,713.89.

The payoff analysis of August 22, 1991, sought a minimum interest balance of $106,191.50.

MIC now disavows the $45,713.89 figure. Both Mr. Mee, over whose signature it went forth, and Mr. Stobbe, in whose jurisdiction such mathematical endeavors appear to belong, deny doing the calculations. Mr. Stobbe places the blame on Mr. Mee, and Mr. Mee designates Mr. Stobbe's accounting department as the culprit.

As to the $106,191.50 calculation, Mr. Stobbe confesses that he did the deed, but pleads in avoidance that it was an error. MIC now contends that the correct figure should be $58,508.74 on the Pool Note, and zero on the Agreement Balance, since Chelsea Note interest payments exceeded that amount.

■ Stratford urges that MIC be estopped from denying the figure contained in the Mee letter, and that all adjustments should proceed from that point. That position would seem to be supported by Massachusetts law. *Flye v. Hall*, 224 Mass. 528, 113 N.E. 366 (1916); *Blackhall v. Duthie–Strachan*, 258 Mass. 551, 554, 155 N.E. 604 (1927). However, Stratford cannot demonstrate that it relied upon the letter to its detriment; it did not pay the amount demanded.

The first step in arriving at the correct balance is to review the payment history of the New Note, as found in MIC's records introduced into evidence. They show that Stratford made interest payments on the New Note, between July 24, 1989 and October 1, 1991, aggregating $91,490.26.[2]

This amount is deducted from the $150,000 Pool Note to obtain a tentative minimum interest balance due of $58,509.74, just $1.00 more than MIC's final assertion of $58,508.74. The lesser figure will be accepted.

■ Stratford would deduct from the figure just derived some additional pay-

ments made in July, 1989, and applied by MIC to the prior $300,000.00 note. This argument must fail. The Amendment did not serve to bring pre-Agreement note interest into the equation. Stratford had never protested the application of those payments in the past and it is too late to do so now.

Stratford further argues that, once the Agreement Balance had been paid, additional interest payments on the Chelsea Note should be credited against the Pool Note balance. In ¶ 8 of the Findings of Fact the Court has indicated its agreement with that position. As extracted from MIC's records, $15,350.77 is available for application to the minimum interest balance.

Deducting the $15,350.77 leaves $43,157.97, which the Court finds to be the amount due to MIC or its successor in interest for Minimum Interest. If the trustee and the Senior Lenders cannot agree upon the allocation of those funds as between them, either may apply to the Court for relief.

The balance of $15,350.77 held by the trustee shall be paid to Stratford forthwith.

### The issue of GP & H legal fees

GP & H asserts various claims to the escrowed funds, to wit:

A. The loan documents provide that Stratford is obligated to pay MIC's legal fees in connection with these transactions;

B. Under contract rules relating to third-party beneficiaries, GP & H has a direct claim against Stratford for payment of its fees and expenses; and

C. Under the common fund doctrine, GP & H has a claim to payment from the fund superior to the rights of the Senior Lenders and the trustee.

GP & H also asserts that its fees and expenses are neither excessive nor unreasonable as contended by Stratford.

The matters will be addressed in reverse order.

### The common fund doctrine of restitution

GP & H correctly relates that under the common fund doctrine, an attorney is entitled to recover from a fund the value of services to the extent the attorney's efforts create, preserve or protect the fund, even

---

**2.** No party contends that the substantial amount of "Late Charges" paid were interest for purposes of the Minimum Interest provision or the Amendment.

though not all beneficiaries of the fund are clients. It cites a line of cases extending roughly from *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881) to *Kargman v. Sullivan*, 589 F.2d 63 (1st Cir.1978) and *Coggins v. New England Patriots Football Club, Inc.*, 406 Mass. 666, 550 N.E.2d 141 (1990).

■ It contends that since the primary focus of its legal services to MIC was to protect the collateral which had been pledged by MIC to the Senior Lenders, and to maximize the realization on that collateral, it is entitled to the benefit of the rule.

In making this claim GP & H ignores a crucial distinction between its position in this case and that of the attorney-beneficiary in all other cases which the Court has examined.

In each of those cases, the attorney performed services on behalf of a client which was a member of a group of similarly situated persons, and was allowed, under the doctrine, to charge for its services against the sums recovered by others similarly situated. As stated by the United States Supreme Court in *Greenough*,

> [W]here *one of many parties having a common interest in a trust fund*, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts.

105 U.S. at 532–533 (emphasis added).

Similarly, in *Coggins*, the Supreme Judicial Court speaks of the principle applying "where a party has, at his or her own expense, been successful in creating, preserving or enlarging a fund in which other parties have a rightful share," 406 Mass. at 669, 550 N.E.2d 141, that is, when the primary claimant and other parties share an interest in the fund. A client's membership in the protected class is the ticket of admission to the fund for counsel.

In the present case, the interest represented by GP & H was not that of one of the Senior Lenders who were mortgagees, but of the mortgagor. The claim under the common fund doctrine must fail.

### GP & H as third party beneficiary

■ Massachusetts law now adopts the general American rule that " 'creditor' beneficiaries may sue on contracts to which they were not parties," *Choate, Hall & Stewart v. SCA Services, Inc.*, 378 Mass.

535, 543, 392 N.E.2d 1045 (1979), quoting Professor Corbin:

> 'If the promisee in a contract contemplates the present or future existence of a duty or liability to a third party and enters into the contract with the expressed intent that the performance contracted for is to satisfy and discharge that duty or liability, the third party is a creditor beneficiary' entitled to enforce the contract. *Id.*

To determine whether the movant is a creditor beneficiary entitled to collect directly from the promisor, or is no more than an incidental beneficiary without such rights, we are directed to "search for indicia of intention against the background of the transaction." 378 Mass. at 546, 392 N.E.2d 1045.

As noted by the Court of Appeals, the *Choate* decision allowed recovery directly from the promisor because the contract specifically provided for direct payment. *Public Service Co. v. Hudson*, 938 F.2d 338, 342 (1st Cir.1991). There is no such provision here. The *Hudson* court observed that

> Ever since Choate ... Massachusetts courts steadfastly have refused to accord intended beneficiary status under a contract whose terms, interpreted in the particular transactional setting, do not provide for the benefits of performance to flow directly to the third party.

The Court finds that neither the text nor the context of the loan documents is reasonably susceptible to the interpretation that the benefits of Stratford's performance were to run directly to GP & H. Indeed, prior to the filing of the original petition in this case, MIC had made a direct payment to GP & H notwithstanding that Stratford had made no payment of fees to it. GP & H's statements were addressed to MIC. *Rae v. Air–Speed, Inc.*, 386 Mass. 187, 435 N.E.2d 628 (1982), relied upon by GP & H, is distinguishable on its facts.

GP & H is not entitled to direct payment of any fees due from Stratford. It remains, as it was, a creditor of MIC.

### Stratford's responsibility for MIC's legal fees

In the various loan documents, Stratford agreed, *inter alia*, to pay all charges in connection with the collection and enforcement of the various notes, "including reasonable attorneys' fees." The mortgage language is somewhat broader and does not add "reasonable" before "attorneys fees."

■ With or without the prefatory adjective, any attorney fees payable in connection with these proceedings must be fair and reasonable. *Trustees v. Ramsdell,* 28 Mass.App. 584, 554 N.E.2d 34 (1990) and cases cited.

The Court has carefully considered the objections to GP & H's fees voiced by Stratford's witness, and has reviewed the detailed statements in evidence. It concludes that GP & H appeared to have assigned excessive numbers of staff members to the matter, the most significant product of which was a vastly increased amount of internal conferencing between the players. Stratford puts the figure at something akin to 20% of the billed time, but the Court finds *that* percentage to be excessive as well.

The Court concludes that a reasonable attorneys' fee in this matter would be $31,-500, and that amount shall be paid to MIC or the Senior Lenders from the escrowed funds, as shall the expenses sought of $1,355.42. If the trustee and the Senior Lenders cannot agree upon the allocation of those funds as between them, either may apply to the Court for relief. The remainder of the sum held for this purpose, $5,698.00, shall be paid forthwith to Stratford.

### The trustee's legal fees

The remaining issue concerns the $19,-298.70 held in escrow against determination of the trustee's legal fees incurred in connection with this proceeding. The trustee's counsel is directed to file an application for allowances as against that amount within four weeks from the date of this opinion. Any objections to that application shall be filed within one week thereafter. The Court will then consider the application and any objections and rule thereon at a hearing which will be scheduled.

## MEMORANDUM REGARDING THE MOTION FOR RECONSIDERATION OF STRATFORD MANAGEMENT ASSOCIATES

### Feb. 3, 1992.

Stratford Management Associates ("Stratford") asks the Court to reconsider certain aspects of its order dated January 14, 1992, regarding the disbursement of certain insurance proceeds. In so doing, it has undertaken a very substantial burden.

A motion for reconsideration is not a vehicle for raising issues or citing authorities a party could or should have presented prior to the court's ruling. It is not a vehicle for rehashing arguments previously made or for refuting the court's prior ruling. A motion to reconsider is appropriate where the court has clearly misunderstood a party, has made a decision outside the issues presented by the parties, has made an error not of reasoning but apprehension, or where there has been a significant change in the law or the facts since the court's prior ruling.

*In re Grand Builders, Inc.,* 122 B.R. 673, 675 (Bankr.W.D.Pa.1990) (citations omitted).

■ Unless the movant can demonstrate "manifest errors of fact or law" reconsideration is inappropriate; it is not a substitute for an appeal. *In re Oak Brook Apartments,* 126 B.R. 535, 536 (Bankr.S.D.Ohio 1991).

### DISCUSSION [1]

In its prior opinion the Court effectively held that Stratford was estopped to deny the application of payments made shortly after the execution of the Amendment and the New Note on June 12, 1989. Stratford's witness contended that Stratford did not learn of the application of the payments by MIC until just before or during trial on the issue.

The Senior Lender's memorandum in opposition to the motion to reconsider points out that Stratford "all along had access to information with which to determine how interest payments were being allocated." To some extent they are correct. The testimony of Mr. Stobbe, not contradicted, was that each monthly statement sent to the debtor contained "a brief history of the most recent six transactions."

The first of the three payments in issue, $7,984.65, is reflected on MIC's records as having been received on June 22, 1989. MIC applied it to the old note, $7,752.08 as interest and $232.57 as late charges. The second, in the amount of $3,812.50, was received on July 7, 1989, and applied to interest on the old note. At the time of posting of these payments, MIC still carried a $300,000 balance on the old note. It was not reduced to zero, and the New Note opening balance in the same amount posted, until about July 20, 1989.

---

**1.** The following discussion uses the terms defined in the Findings of Fact of the January 14 opinion, which findings remain unchanged.

The third payment, amounting to $2,287.50, was received on July 24, 1989. It was posted to the old note (which had a zero principal balance in MIC's computer by that time) as "INT ADJ CR," which the court interprets as an interest adjustment credit. The same amount was applied the same day to the New Note as "INT ADJ DB," but that treatment was reversed by a handwritten entry as "prior loan interest carry-forward" on the exhibit introduced into evidence.

Pasting this evidence together, the Court finds that Stratford should not be estopped to contend that the final payment should have been applied to the New Note. MIC's witness' testimony would indicate that the monthly statement to Stratford would have told them, had they but considered it, that (1) the first two payments had *not* been applied to the New Note, but that (2) the last had. There is no evidence that "off line" pencil reversal of the entry on the exhibit before the court had been given to Stratford. Stratford had no notice that MIC had changed its mind.

Accordingly, as to this payment only, the Court finds that it did commit a manifest error of misapprehension and will grant the motion for reconsideration. Having reconsidered it finds that the minimum interest amount should be reduced by an additional $2,287.50, and that amount be added to the payment from the trustee to Stratford.

The other arguments advanced by Stratford are not sufficiently convincing and no further changes will be made in the prior ruling as regards Stratford.