**In re FILENE'S BASEMENT, INC. and Filene's Basement Corp., Debtors.**

**Nos. 99–16984–WCH, 99–16985–WCH.**

United States Bankruptcy Court, D. Massachusetts.

Oct. 4, 1999.

Patrick P. Dinardo, Barbara D. Gilmore, Sullivan & Worcester LLP, Boston, for T.A.C. Group, Inc.

Paul P. Daley, Mitchel Appelbaum, Hale and Dorr LLP, Boston, for debtors.

Gary L. Donahue, United States Department of Justice, Boston, for J. Christopher Marshall, United States Trustee.

## DECISION ON MOTION TO RECONSIDER THE GRANTING OF MOTION TO EMPLOY HALE & DORR LLP

WILLIAM C. HILLMAN, Chief Judge.

### I. Introduction

On August 23, 1999, Filene's Basement, Inc. and Filene's Basement, Corp. (the "Debtors") filed voluntary chapter 11 petitions. Accompanying the petitions (which I subsequently ruled would be jointly administered) were applications to employ Attorney Paul P. Daley ("Daley") and the law firm of Hale and Dorr LLP ("H & D" or "the Firm") which I allowed on August 24, 1999. On September 3, 1999, T.A.C. Group, Inc. ("T.A.C.") filed a motion for reconsideration of the appointment of H & D as Debtors' counsel (the "Motion"). In it, T.A.C. alleges that H & D is not a disinterested person as required under the Bankruptcy Code, has a conflict of interest due to representation of T.A.C., and holds interests potentially adverse to the Debtors' estate. At what may be loosely described as a preliminary hearing on the Motion, I directed H & D to respond in detail to the allegations of the motion by a date certain. I also scheduled a hearing at which I would receive such evidence as T.A.C. and H & D thought would assist me in my consideration of the Motion. I received the requested responses as well as memoranda and supporting affidavits. On September 29, 1999, I held a hearing and offered all parties in interest the opportunity to cross examine the affiants which declined. No party brought further materials before me. The United States Trustee filed a response supporting the Motion.

The allegations of the Motion, if substantiated, at least raise the question of whether, in granting the motion to employ, I committed "manifest errors of fact or law" or that there is newly discovered

evidence which would lead me to reverse myself. *In re Mortgage Investors Corp.,* 136 B.R. 592 (Bankr.D.Mass.1992); *In re Wedgestone Financial,* 142 B.R. 7 (Bankr. D.Mass.1992). For the reasons stated below, I grant the motion for reconsideration and vacate the prior order appointing H & D as counsel to the Debtor and deny the application to employ.

## II. Factual Assertions

Daley's Rule 2014(a) statement (the "Statement") accompanying the application seeking employment of H & D (called "the Firm" in the Statement) contained the following averments:

2. Neither I, the Firm, nor any partner, counsel or associate thereof, insofar as I have been able to ascertain, holds or represents any interest adverse to the estate of [the Debtors].

3. I have caused the Firm to compare the Debtors' list of their 20 largest unsecured creditors, the Debtors' secured lenders, the Debtors' landlords, and list of officers, directors and 5% shareholders, with the Firm's client database to identify creditors or shareholders with which the Firm has any connection and made reasonable inquiry regarding whether any partners or employees of the Firm own any equity interest in the Debtors. Such comparisons, searches and inquiries have revealed the following:

a. The Firm has represented the Debtor prepetition, since July 1998, as its general counsel in connection with various corporate, litigation and other matters as specifically assigned by the Debtors. The Firm has been paid currently for all services rendered.

b. Certain creditors (or affiliates thereof), shareholders and individuals are clients of the Firm as revealed during the inquiries described in Section 2[sic]. Attached hereto as *Exhibit A* is a listing of the clients and a description of the Firm's services to such clients.[1]

The billings to any one client or the aggregate group is not material to the Firm's revenues. Individually, no client represented more than 1% of the Firm's total billings, and the aggregate group represented less than 1.1% of the total billings, of the Firm for calendar year 1998.

c. The Firm has and continues to represent T.A.C. Group, Inc. ("T.A.C.") in connection with discrete financing and corporate matters entirely unrelated to the Debtors. T.A.C. is a plaintiff in a lawsuit naming the Debtors as defendants. The Firm does not represent either party in such lawsuit and will not provide representation to T.A.C. in connection with any matters or dealings in these Chapter 11 cases.

The litigation between T.A.C. and the Debtors described in the Statement (the "State Court Action") also names as a defendant James McGowan ("McGowan"), a former president of T.A.C. and present vice president of the Debtors. In the Motion, T.A.C. describes the litigation, and H & D's involvement with its subject matter as follows:

In the State Court Action, which arises out of the Debtor's employment of McGowan, T.A.C. alleges harm caused by the Debtor's and McGowan's use of T.A.C.'s trade secrets and confidential business information in violation of, among other things, a confidentiality and nondisclosure agreement drafted by Hale and Dorr in its capacity as General counsel to T.A.C.

T.A.C. further describes its relationship with H & D in this way:

6. Hale and Dorr has been T.A.C.'s general counsel for approximately 18 years. In fact, with a few exceptions, Hale and Dorr represents T.A.C. on all of its legal matters, including real estate, corporate, financing, labor and employment, trademark, and intellectual prop-

1. Surprisingly, T.A.C. does not appear on Exhibit A.

erty matters. T.A.C. relies on Hale and Dorr not simply to handle discrete assignment [sic] that T.A.C. assigns to it, but many of the matters that Hale and Dorr handles for T.A.C. are of an ongoing nature and have been ongoing for many years. T.A.C. relies on Hale and Dorr to alert T.A.C. to legal issues affecting T.A.C.'s business and to bring legal problems to T.A.C.'s attention on the many ongoing matters that Hale and Dorr handles. Thirty-four Hale and Dorr lawyers, and 23 other time charging professionals at Hale and Dorr, have done legal work for T.A.C. in the last three years alone. As set forth in the Doxer Affidavit [q.v.], by any measure, T.A.C. is a substantial client of Hale and Dorr.

7. At least one Hale and Dorr attorney who has appeared for the Debtors in this case, Mitchel Appelbaum, is working for T.A.C. on an on-going bank financing matter and TAC [sic] anticipates that it will need to continue to use Mr. Appelbaum on this matter.

8. Hale and Dorr represented T.A.C. in connection with the termination of McGowan's employment. Without T.A.C.'s knowledge or consent, Hale and Dorr also represented the Debtor in connection with the Debtor's later hiring of McGowan, which gave rise to T.A.C.'s litigation against the Debtor. Indeed, as set forth in the Doxer Affidavit, Hale and Dorr was negotiating the Debtor's employment agreement with McGowan while McGowan was still on T.A.C.'s payroll under an agreement that Hale and dorr [sic] negotiated for T.A.C.

. . . .

10. Three Hale and Dorr senior partners have been deposition witnesses and will be trial witnesses in T.A.C.'s lawsuit against Debtor, offering testimony that will impeach statements made under oath by officers of the Debtor.

In response to these allegations, H & D tendered these rejoinders:

6. Hale and Dorr has represented TAC in various matters beginning about 1981. Hale and Dorr denies that it has been TAC's "general counsel" for 18 years: denies that is [sic] represents TAC on all its legal matters and admits that it handles discrete legal assignments from TAC, Some of which may be "ongoing" in the sense that follow-on work may be needed. Hale and Dorr has not been retained as "general counsel" by TAC nor has Hale and Dorr been engaged to alert TAC to legal issues affecting TAC's business or to bring legal problems to TAC's attention, except for issues arising in a specific assignment about which TAC seeks legal advice.

Hale and Dorr admits that a number of lawyers and paralegals have done legal work for TAC in the last three years, but only four lawyers and one paralegal worked an average of 17 hours or more a year for TAC during that three-year period. TAC's billings, over both the 18–year period (which totaled not the $2,000,000 to $3,000,000 alleged by Mr. Doxer but $1,510,045) and the last three years, average less than 0.1% of Hale and Dorr's annual billings. Hale and Dorr denies that TAC is a "substantial client" as that term would normally be used by lawyers evaluating the importance of a given corporate client to a firm.

The Debtors further state that in each of the last several years (including 1999), TAC requested that Hale and Dorr furnish its auditor an audit letter. In each audit letter, Hale and Dorr responded to TAC's auditor that it did *not* represent TAC on a regular basis and that its engagement was *limited* to specific matters as to which Hale and Dorr was consulted by TAC, i.e., a special counsel not a *general counsel* audit letter. Mr. Doxer received a copy of each audit letter. Copies of the audit letters in redacted form for the years 1994–1999 are attached to the Affidavit of Mitchel Appelbaum as Exhibit A.

7. Mr. Appelbaum worked for TAC on bank financing documents prior to August 11, 1999. Since that date he has done no work for TAC. He commenced work for Debtors on August 16, 1999. At no time did he work on TAC's and Debtors' matters simultaneously. TAC's loan documentation matter on which Mr. Appelbaum worked has nothing to do with the Debtors or these proceedings. Hale and Dorr denies the remaining allegations in paragraph 7.

8. Hale and Dorr drafted Mr. McGowan's severance agreement dated June 19, 1999. Subsequent to the signing of that agreement, Hale and Dorr was asked by Debtors to draft an employment agreement with Mr. McGowan and drafts were exchanged with Mr. McGowan's counsel. The terms were negotiated by the Debtors and Mr. McGowan. Hale and Dorr did not advise the Debtors with respect to Mr. McGowan's severance agreement with TAC, his post-severance obligations, if any, to TAC, or his status, if any, on or off TAC's payroll. Mr. McGowan's severance agreement, which Debtors were provided by Mr. McGowan, had no non-competition clause, a fact obvious from the document and independently known to Debtors. Ultimately, Mr. McGowan's severance agreement was an Exhibit to Mr. McGowan's employment contract with Debtors. Hale and Dorr denies the remaining allegations in paragraph 8.

9. Hale and Dorr agrees that it was unable to represent either TAC or the Debtor in the State Court Action and asserts that each party obtained separate counsel. Hale and Dorr denies that there is any conflict preventing Hale and Dorr from vigorously representing the Debtors in these proceedings. Hale and Dorr denies that the existing TAC/Filene's State Court Action is a conflict preventing Hale and Dorr from representing Debtors. Mintz, Levin has been retained to and will litigate that claim on behalf of the Debtors and Hale and Dorr has no conflict.

10. Three senior partners of Hale and Dorr were deposition witnesses in the State court Action. Hale and Dorr has not been informed by either party that those three partners will be witnesses in the litigation and does not believe they will be witnesses. If they were to be called as witnesses (which is entirely speculative at this point) they would merely be fact witnesses and the weight and impact of their testimony as fact witnesses were to be given, it would not be hostile or adverse to either party but a recitation of facts to be weighed and evaluated by the trier of fact. Hale and Dorr denies the remaining allegations in paragraph 10.

### III. Discussion

A. *The Disclosure Requirements of 11 U.S.C. § 327(a) and Fed.R.Bankr.P. 2014.*

The Bankruptcy Code allows a trustee to retain professionals, subject to court approval, "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). As the Court of Appeals for the First Circuit has observed, the thrust of § 327 is to "ensur[e] that all professionals appointed pursuant to § 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Rome v. Braunstein*, 19 F.3d 54, 57 (1st Cir.1994).

■ The Federal Rules of Bankruptcy Procedure require that an applicant file a verified statement disclosing "the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed.R.Bankr.P.2014(a) *passim*. "The purpose of the disclosure requirements is to provide the court with information necessary to determine whether the profession-

al's employment meets the broad test of being in the best interests of the estate." *In re Lincoln North Assoc.*, 155 B.R. 804, 807 (Bankr.D.Mass.1993).

■ It has been held that the requirements of the rule transcend those of § 327(a), as they mandate disclosure of all connections with the named parties, rather than being limited to those which deal with disinterestedness. *In re Leslie Fay Cos.*, 175 B.R. 525, 536 (Bankr.S.D.N.Y.1994). "It is counsel's obligation to come forward with the information concerning his interests." *In re Guard Force Management, Inc.*, 185 B.R. 656, 661 (Bankr.D.Mass. 1995), *quoting In re Flying E Ranch Co.*, 81 B.R. 633 (Bankr.D.Colo.1988). Failure to be forthcoming with disclosure provides the bankruptcy court with an independent ground for disqualification. *Miller v. United States Trustee (In re Independent Engineering Co.)*, 232 B.R. 529, 532 (1st Cir. BAP 1999); *Leslie Fay Cos.* at 533; *In re EWC, Inc.*, 138 B.R. 276, 281–82 (Bankr.W.D.Okla.1992). *See also Smith v. Marshall (In re Hot Tin Roof, Inc.)*, 205 B.R. 1000, 1003 (1st Cir. BAP 1997) (stating professionals "cannot pick and choose which connections are irrelevant...").

■ The Statement revealed that H & D "has [represented] and continues to represent T.A.C. Group, Inc. ("T.A.C.") in connection with discrete financing and corporate matters entirely unrelated to the Debtors." The Motion and the Firm's response thereto demonstrate a continuing relationship over 18 years, resulting in the payment by T.A.C. to the Firm of over $1,500,000 in fees,[2] although it denies T.A.C.'s contention that it serves as its general counsel.

More troublesome is the Firm's description of the litigation between T.A.C. and the Debtors, which appears above, but which I repeat here for convenience:

T.A.C. is a plaintiff in a lawsuit naming the Debtors as defendants. The Firm does not represent either party in such lawsuit and will not provide representation to T.A.C. in connection with any matters or dealings in these Chapter 11 cases.

■ "[C]oy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Saturley*, 131 B.R. 509, 517 (Bankr.D.Me.1991). I now know that the litigation involves McGowan, once president of T.A.C. and now an officer of Debtors, and that the plaintiff asserts violation by McGowan and the Debtors of certain rights of T.A.C. I further have been made aware that H & D represented T.A.C. in connection with the termination of McGowan's employment; that it represented the Debtors in connection with the hiring of McGowan; and that three partners in the Firm have given depositions in connection with the litigation. T.A.C.'s contention is that the three partners will be called as witnesses and will give testimony questioning the veracity of statements by officers of the Debtors. The Firm's rejoinder, that the attorneys would merely recite facts if called as witnesses, strikes me as a bit disingenuous

■ Other facts not disclosed in the Statement include the fact that T.A.C. is a competitor of the Debtors and that the Debtor's business plan calls for it to open a series of stores strikingly similar in concept to T.A.C.'s operations. The mere fact of competition between two clients is not disqualifying where the two parties do not hold or assert claims against each other and do not "assert competing claims to an economic interest". *In re Caldor, Inc.*, 193 B.R. 165, 171 (Bankr.S.D.N.Y.1996). This case contains additional disqualifying elements.

2. Since this is less than 1/10 of 1% of the Firm's annual billings in recent years, it does not consider T.A.C. a "substantial client."

■ Based upon the matters quoted and cited above, I conclude that the Statement fails to satisfy the Firm's obligation to make full disclosure of connections with parties in interest as required by the rule. This could, under the authorities cited above, result in disqualification or fee reduction. *See Leslie Fay Cos., supra.*

**B. The Disinterested and Lack of Interest Adverse Requirements of 11 U.S.C. § 327(a) and Fed.R.Bankr.P.2014.**

■ The First Circuit observed in *Rome* that the Bankruptcy Code requires "rigorous conflict-of-interest restraints upon the employment of professional persons in a bankruptcy case." *Rome,* 19 F.3d at 57. "The disinterestedness requirements must be strictly enforced." *Smith,* 205 B.R. at 1003. *See also Miller* 232 B.R. at 531. It has been observed that § 327 imposes a duty on the bankruptcy court "which demands that the court root out impermissible conflicts of interest between attorney and client." *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987).

The Code does not define "adverse interest." In *Rome* the First Circuit described "interest adverse" as the "possess[ion] or assert[ion][of] mutually exclusive claims to the same economic interest, thus creating either an actual or potential dispute between rival claimants as to which ... of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) [the possession of] a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities." *Rome,* 19 F.3d at 58 n. 1 (quoting *In re Roberts,* 46 B.R. 815, 826–27 (Bankr.D.Utah 1985)). *See also In re Angelika Films 57th Inc.,* 227 B.R. 29, 38 (Bankr. S.D.N.Y.1998); *In re Granite Partners,* 219 B.R. 22, 33 (Bankr.S.D.N.Y.1998). The term "interest adverse to the estate" may in fact be broader than it appears. In *Granite Partners,* the Bankruptcy Court for the Southern District of New York found that "adverse interest" pertains to "any interest, however slight, 'that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.'" *See In re Granite Partners,* 219 B.R. at 33 (quoting *In re Roberts,* 46 B.R. at 828 n. 26).

The Code defines "disinterested person" as including any person that "does not have an interest materially adverse to the interest of the estate or of any class of creditor or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ...." U.S.C. § 101(14)(E).

By its terms, § 327 appears to envision a two prong analysis of "adverse interest" and "disinterestedness," but the courts have observed that such an approach is redundant. *Martin* at 175, 179 n. 4; *In re Granite Partners,* 219 B.R. at 33. Many courts, including the First Circuit, have favored a single determination of "whether any competing interest of a court-appointed professional 'created a meaningful incentive to act contrary to the best interest of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one.'" *Rome,* 19 F.3d at 58 (quoting *Martin,* 817 F.2d at 180). *See also In re Granite Partners,* 219 B.R. at 33; *In re The Leslie Fay Cos.,* 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994). While combining the stated two elements into one, the *Martin* formulation enunciates the long-standing additional test relating to the appearance of impropriety; that is, even if there is not in fact a competing interest of the type described above, if there is a reasonable perception of such an interest, the applicant should be disqualified. "Section 327 is intended ... to address the appearance of impropriety as much as its substance...." *Martin* at 180.

**1. Actual Conflict of Interest**

■ Stated most simplistically, the Firm is regularly engaged by T.A.C. to

handle legal matters of various kinds, and has been for almost a score of years. T.A.C. is now engaged in litigation against the Debtors, whom H & D serve as general counsel. While it is true that the Firm is technically aloof from the conflict, in that it represents neither of the antagonists, it is a part of the proceedings, as the litigation will involve contracts drawn by H & D for both sides; the interpretation of those contracts; and possible testimony of partners in the Firm regarding various related matters. Further, the chief executive officer of the Debtors has testified that the Debtors' business plan is based in large part on the establishment of stores which adopt the techniques used by T.A.C. One obvious purpose of the litigation is to retard Debtors' learning curve in this regard.

■■■ Under these circumstances, I find that there is an actual adverse interest in the Firm's continued representation of T.A.C. while it seeks to represent the Debtors. When there is an actual conflict of interest, disqualification is mandatory. *United States Trustee v. First Jersey Securities, Inc. (In re First Jersey Securities, Inc.)*, 180 F.3d 504, 509 (3d Cir.1999).

### 2. *Perception of Conflict*

■■■ Even if I were to determine that the conflict is not yet ripe, but merely incipient; that I do not know the outcome of the State Court Action nor the extent to which that outcome may affect the possibility of success for Debtors' plan or reorganization, I would nonetheless hold that there is an obvious appearance of impropriety in the dual representation. "[S]ince section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of interest normally should be resolved in favor of disqualification." *Rome*, 19 F.3d at 60. The purpose of the disinterestedness requirement is to "prevent even the appearance of a conflict . . . which might be reflected in [the attorney's] decision[s] concerning estate matters." *Martin*, 817 F.2d at 180.

Consider hypothetically things which might occur: If the Debtors prevail in the State Court Action because of the content of the agreement whereby McGowan's employment by T.A.C. was terminated, T.A.C. might feel compelled to bring a malpractice action against the Firm. Contrawise, if the final result should be success for T.A.C., with Debtors held liable because of their employment of McGowan, it might be the debtors who seek indemnity from H & D because it was upon the Firm's advice that it entered into an employment contract with McGowan. If T.A.C. should be awarded large amounts of damages, payment might adversely affect the feasibility of any plan Debtors might propose, and on whose lap would the blame be laid? If Debtors should be enjoined from utilizing the services of McGowan, and those services should be critical to the reorganization, where might the finger of blame be pointed? If Debtors' reorganization should fail, would this benefit the Firm in its ongoing representation of T.A.C.?

Even if there is no present adverse interest, both the potential for a conflict and the perception that there might be such are clear to me. A potential conflict constitutes a ground for disqualification under § 327. *First Jersey Securities, supra.*

### IV. *Conclusion*

■■■ I hold that H & D has failed fully to disclose its connections with parties in interest as required by Rule 2014 and that it lacks disinterestedness in this case either because of an actual present adverse interest or the appearance of one.

The First Circuit has most correctly noted, in considering the sanction to be imposed, that "the bankruptcy court cannot always assess with precision the effect the conflict may have had either on the results achieved or the results that might have been achieved by following 'the road not

taken.'" *Rome,* 19 F.3d at 62. It is early in this case. A change of counsel at this point, while inconvenient, will eliminate more serious problems down the path. As a result, I grant the motion for reconsideration and vacate my prior order. Writing anew, I deny the Debtors' application to employ H & D, and direct that the retainer paid be returned to the Debtors forthwith. H & D may file an application for reimbursement of actual and necessary expenses which it has incurred.