In re MATCO ELECTRONICS GROUP, INC., Debtor.

In re U.S. Assemblies New England, Inc., Debtor.

In re U.S. Assemblies in Florida, Inc., Debtor.

In re U.S. Assemblies Raleigh, Inc., Debtor.

In re Matco Technologies, Debtor.

In re U.S. Assemblies San Diego, Inc., Debtor.

In re Carolina Assemblies, Inc., Debtor.

In re U.S. Assemblies Hallstead, Inc., Debtor.

In re U.S. Assemblies in Georgia, Inc., Debtor.

In re U.S. Assemblies Endicott, Inc., Debtor.

Nos. 02–60835 to 02–60844.

United States Bankruptcy Court, N.D. New York.

Jan. 11, 2008.

Guy A. Van Baalen, Esq., Assistant U.S. Trustee, Utica, NY.

Berkman, Henoch, Peterson & Peddy, Ronald Terenzi, Esq., of Counsel, Garden City, NY, Former Attorneys–Official Committee of Unsecured Creditors.

Bond, Schoeneck & King, PLLC, Camille W. Hill, Esq., of Counsel, Syracuse, NY, Attorneys for the Official Committee of Unsecured Creditors.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court has before it a motion filed by the Office of the United States Trustee ("UST") on July 9, 2007, in the above-referenced jointly administered cases seeking to review fees pursuant to § 329 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101–1532 ("Code") and for disallowance and disgorgement of fees already paid to Berkman, Henoch, Peterson and Peddy ("BHPP") as former counsel to the Official Committee of Unsecured Creditors ("Committee").[1] On July 26, 2007, the Committee filed a Response in support of the UST's motion. On the same date, BHPP

---

1. By order dated December 16, 2002, BHPP's representation of the Committee was terminated and the firm of Nixon Peabody, LLP ("Nixon") was substituted as Committee counsel. However, in response to a renewed motion filed by Avnet, Inc., a member and co-chair of the Committee, which was later joined in by the UST, on March 23, 2006, Nixon voluntarily consented to the substitution of Bond, Schoeneck & King, PLLC ("Bond") as attorneys for the Committee.

filed its opposition to the motion. On July 30th the UST filed a reply in further support of the motion.

The motion was argued before the Court at Utica on July 31, 2007. Following oral argument, the Court gave all parties until August 24, 2007, to file any additional memoranda of law. On August 24, 2007, both the UST and BHPP filed supplemental papers addressing the motion. The contested matter was submitted for decision as of that date.[2]

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(A).

## FACTS

On February 13, 2002, the Chapter 11 cases of the above-referenced jointly administered Debtors were commenced by the filing of involuntary petitions. On March 18, 2002, the Court entered an Order for Relief effective March 11, 2002. On March 27, 2002 the UST appointed the Committee. Jaco Electronics, Inc. ("Jaco"), one of the petitioning creditors, was named as a member of the Committee.

On April 2, 2002, the Court signed an Order appointing BHPP as counsel to the Committee, retroactive to March 26, 2002. In support of its Application for Retention of BHPP, dated March 29, 2002, the Committee submitted the Affidavit of Ronald M. Terenzi, Esq. ("Terenzi"), who was identified in the Application as "the attorney who will be primarily responsible for this case and a partner with Berkman

Henoch...." In paragraph 7 of the Terenzi Affidavit, in disclosing the firm's potential conflicts of interest, he asserts, "Member(s) and/or employees of Berkman Henoch may from time to time maintain *di minimus* [sic] stock holdings in creditors(s) of the Debtors, which stock is publicly traded on national markets and an attorney is related to and [sic] officer and shareholder of one of the general unsecured creditors of the Debtors." In subsequent developments in these cases, it has been learned that the "attorney" referred to in paragraph 7 of the Terenzi Affidavit was Douglas Spelfogel, Esq. ("Spelfogel") who, at the time of the execution of the Terenzi Affidavit, was the son-in-law of Joel Girsky, the Chief Executive Officer and President of Jaco, the holder of a significant claim against the Debtors, as well as a petitioning creditor and an active member of the Committee. In addition, at some point thereafter, though the date appears to be in some dispute, Spelfogel's wife, Wendy, became the in-house counsel to Jaco.[3]

During BHPP's tenure as counsel to the Committee, it submitted one Application for a Final Allowance of Attorneys Fees and Expenses ("Fee Application") on July 16, 2003. On October 29, 2003, the Court entered an Order awarding BHPP fees of $494,320 and reimbursement of expenses in the amount of $38,424.50 ("Fee Order"). In the Fee Order, the Court, in consideration of certain objections to the Application and notwithstanding its styling as a "Final Application," directed that 30% of the approved fees and 10% of the approved

**2.** On August 27, 2007, BHPP filed a Sur–Reply Supplemental Submission Brief in Opposition to Motion. By letter, dated September 5, 2007, the UST objected to the untimely filing of the Sur–Reply. Via an e-mail to BHPP and the UST, dated September 6th, the Court advised that it would not consider the untimely Sur–Reply.

**3.** On December 27, 2005, some three plus years after the appointment of BHPP, Spelfogel, no longer affiliated with BHPP and then a member of Nixon, filed a Supplemental Affidavit in which he disclosed in paragraph 2, "In addition, my wife and her father are employed by Jaco as in-house counsel and CEO, respectively."

expenses be held back "pending final applications pursuant to § 330 of the Bankruptcy Code."[4]

## ARGUMENTS

The UST maintains that BHPP's Application for Retention was purposely vague with regard to Spelfogel's relationship to Jaco, thereby depriving the Court and other parties in interest of the opportunity to fully consider that relationship in deciding whether or not to appoint BHPP as counsel to the Committee. The UST relies primarily on the requirements of Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."), noting that the Rule is intended to provide the Court with sufficient information to allow it to determine whether or not a professional's appointment is in the best interest of creditors. The UST contends that it is not within the judgment of the professional to determine what facts should be disclosed as being relevant to its appointment. Rather, the UST argues that all facts that in any way bear on the issue of disinterestedness must be fully disclosed. Failure to make such disclosure, the UST asserts, warrants denial of all compensation for postpetition services. Here, the UST argues that BHPP's vague and incomplete disclosure of Spelfogel's relationship to the CEO of Jaco was intended to, and did in fact, cause the UST and the Court to overlook an otherwise disqualifying factor. The UST contends that BHPP's non-disclosure was not the result of mistake or inadvertence but was rather a deliberate attempt to avoid scrutiny of the Spelfogel/Jaco relationship and is of such a serious nature as to warrant denial of all compensation to BHPP, as well disgorgement of all compensation already paid. Further the UST asserts that whether or not actual harm resulted from BHPP's failure to adequately disclose the relationship is irrelevant on the question of denial and disgorgement of fees. The UST points to the voluntary withdrawal from representation of the Committee and waiver of all fees by Nixon, BHPP's successor, following the later disclosure by Spelfogel that not only was his father-in-law the CEO of Jaco, but that his wife was its in house counsel.[5] The UST notes that BHPP still has not amended its Fed. R.Bankr.P.2014 Statement to disclose Spelfogel's specific relationship with Jaco, notwithstanding a continuing obligation to do so. Finally, the UST argues that an award of fees to BHPP will adversely impact on the holders of other administrative claims in cases that are dangerously close to being administratively insolvent.

In response, BHPP seeks to draw a distinction between its representation of the Committee and that of Nixon, opining that the circumstances surrounding its representation were vastly different. First, it asserts that during Nixon's representation of the Committee, Spelfogel was the attorney primarily responsible for handling the representation, whereas in BHPP's representation of the Committee, Terenzi was the lead attorney, notwithstanding the fact that when Spelfogel left BHPP he took the representation of the Committee with him to Nixon.[6] Second,

---

**4.** BHPP received a retainer of $27,000 which it presumably applied to the compensation awarded by the Order of October 29, 2003.

**5.** The UST asserts, "the gravity of the circumstances now before the Court is demonstrated by Nixon Peabody's voluntary withdrawal as counsel to the Committee and subsequent waiver of fees, totaling more than One Million dollars." See UST's *Memorandum of Law*, dated July 9, 2007 at 16.

**6.** It is also noted that a review of the Fee Application reveals that during the time period covered by the Application, BHPP billed a total of 704.60 hours on behalf of Spelfogel ($225,472) while billing a total of 409.8 hours on behalf of Terenzi ($143,430). (See ¶ 17 of the Fee Application)

BHPP notes that while Nixon admitted to representing Jaco in other matters while simultaneously representing the Committee, BHPP at no time represented Jaco in any matter. Third, BHPP points out that it was only during Nixon's representation of the Committee, utilizing Spelfogel as its lead attorney, that Spelfogel's wife began working for Jaco as in-house counsel. Finally, BHPP points to Code § 1103(b), which it contends does not disqualify a law firm from representing a creditors committee simply because an attorney in the firm is related by marriage to one of the committee members.

The UST is critical of BHPP's response, suggesting that it misses entirely the issue before the Court, that being BHPP's failure to disclose a potential conflict of interest in compliance with Fed.R.Bankr.P. 2014. The UST reiterates its contention that the duty to disclose is broad in scope and that BHPP's veiled reference to Spelfogel's relationship to Jaco was intended to minimize and mislead any party in interest, as well as the Court. It also disputes Terenzi's assertion that he, not Spelfogel, was the attorney primarily responsible for representation of the Committee, noting numerous pleadings and correspondence filed over Spelfogel's signature during BHPP's tenure as Committee counsel. The UST also takes issue with Terenzi's assertion that it was general knowledge that it was Jaco that introduced BHPP to the creditor group which ultimately became the Committee, noting that it had no such information until BHPP responded to this motion. In its final submission to the Court, the UST emphasizes that in order to comply with Fed.R.Bankr.P.2014, a professional must disclose its "connections" with the debtor, creditors and any other party in interest, and it is that precise obligation that BHPP purposely evaded in seeking appointment as Committee counsel.

In its Supplemental Brief, BHPP argues one final time that the disclosure made in its Application for Retention regarding Spelfogel's relationship to Jaco fully complied with the mandate of Fed.R.Bankr.P. 2014, especially given the fact that at the time the Application was submitted the only known creditors in the cases were the petitioning creditors who later made up the Committee. Therefore, BHPP opines, it was obvious to those creditors that, "one of the general unsecured creditors" referred to in paragraph 7 of the Terenzi Affidavit was Jaco.[7] BHPP asserts that at no point did any party interest, including the UST, ever request any further information regarding the specific disclosure made in the Terenzi Affidavit submitted in support of the Application for Retention.

## DISCUSSION

■ It is abundantly clear that Fed. R.Bankr.P.2014(a) requires a significant level of disclosure of the proposed professional's "connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." It is equally clear that the level of disclosure outlined in the Rule is mandatory, whether or not that disclosure would unearth a conflict of interest. See *In re Condor Systems, Inc.,* 302 B.R. 55, 70 (Bankr.N.D.Cal.2003); *In re Granite Partners L.P.,* 219 B.R. 22, 35 (Bankr.

---

7. The UST disputes BHPP's contention that at the time it submitted the Application for Retention, the only known creditors in the cases were the members of the Committee but argues that even if that were true, "the choice of language in the Terenzi Affidavit, nonetheless, appears misleading". *See* UST's Reply in Further Support of Motion, dated July 30, 2007 at ¶ 9.

S.D.N.Y.1998), citing *In re The Leslie Fay Companies, Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y.1994). It is also apparent that the obligation to disclose is not a subjective one, whereby the professional discloses only those "connections" that he/she/it concludes are relevant. *See In re Fibermark, Inc.*, Case No. 04–10463, 2006 WL 723495 at *8 (Bankr.D.Vt. March 11, 2006); *In re WorldCom, Inc.*, 311 B.R. 151, 164 (Bankr.S.D.N.Y.2004); *In re Mercury*, 280 B.R. 35, 56 (Bankr.S.D.N.Y.2002), *aff'd* 122 Fed.Appx. 528 (2d Cir.2004), citing 1 COLLIER ON BANKRUPTCY ¶ 8.05, at 8–60 (Lawrence P. King et al. eds., 15th ed. Rev.2001) ("professionals may not make unilateral determinations regarding the relevance of particular connections, or that certain connections to the debtor are too insignificant to disclose. All connections must be disclosed").

■ As indicated, the existence of a conflict of interest is not the quid pro quo for whether or not disclosure must be made. Sanctions are imposed for the failure to disclose, regardless of the consequences of the non-disclosure. *See Condor Systems*, 302 B.R. at 70, n. 28, citing *In re C.F. Holding Corp.*, 164 B.R. 799, 806 (Bankr. D.Conn.1994) for the view that "in the Second Circuit a violation of the disclosure rule alone is sufficient to deny compensation regardless of whether the undisclosed connection was materially adverse to the estate;" *see also In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr.W.D.Okla.1992) (indicating that "[v]iolation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were *de minimis* ").

In the instant contested matter, it is beyond dispute that BHPP initially disclosed that, "an attorney is related to and [sic] officer and shareholder of one of the general unsecured creditors of the Debtors." in the Terenzi Affidavit. The question that this Court must answer is whether that disclosure was a sufficient compliance with the requirements of Fed. R.Bankr.P.2014 in light of facts which were known only to BHPP at the time the disclosure was made. If the Court concludes that the disclosure was inadequate or worse, purposefully vague and misleading, then the Court must consider the appropriate sanctions. *WorldCom*, 311 B.R. at 164; *Condor Systems*, 302 B.R. at 73; *see also In re Fretter, Inc.*, 219 B.R. 769, 776 (Bankr.N.D.Ohio 1998) (recognizing the variety of sanctions imposed as a result of the failure to make the required disclosures, ranging from a denial of all fees to a reduction in fees). BHPP appears to acknowledge as much when it notes that, "[t]he real issue in the instant case is the sufficiency of the disclosure made by BHPP." *See* Supplemental Brief in Support of Opposition to Motion of the United States Trustee to Review Fees, dated August 24, 2007, at 14. In an effort to convince the Court that its disclosure was adequate, BHPP draws a distinction between Spelfogel's relationship to Jaco while affiliated with it and the expansion of that relationship when he moved to Nixon, as well as Nixon's alleged direct representation of Jaco in other matters.

■ In an effort to analyze the central issue of adequacy of disclosure, the Court must first address some arguments raised by BHPP that would appear to have no relevance. The first is that somehow the adequacy of the disclosure here should be judged by the failure of any party in interest to request additional information from BHPP beyond the statement set out in the Terenzi Affidavit. Fed.R.Bankr.P.2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure

to whet the appetite of the UST, the court or other parties interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure. *Fibermark,* 2006 WL 723495 at *9; *see also In re Filene's Basement, Inc.,* 239 B.R. 850, 856 (Bankr.D.Mass.1999), (indicating that " 'coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient,' " quoting *In re Saturley,* 131 B.R. 509, 517 (Bankr.D.Me.1991)).

Next, BHPP contends that at the time it sought appointment as counsel to the Committee, the only known creditors were those on the Committee and they were well aware of the relationship between Jaco and BHPP, the former having introduced BHPP to the creditor group that ultimately became the Committee. The UST disputes BHPP's contention that there were only a limited number of known creditors at the time of its disclosure, noting that on March 29, 2002, some four days before BHPP filed its Application for Retention, the Debtors filed a "Verification of Creditor Matrix, which certified the Matrix of Creditors consisting of fifty five pages." *See* UST Reply in Further Support of Motion to Review Fees, dated July 30, 2007 at ¶ 8. Again, BHPP seems to misinterpret the requirements of Fed. R.Bankr.P.2014 by suggesting that its obligation under the Rule was somehow defined by what knowledge may already have been possessed by those parties to whom disclosure must be provided. Such an interpretation would stand the Rule on its head, making its application purely subjective and virtually impossible to enforce.

While Spelfogel's relationship to Jaco may not have created a per se conflict of interest at the time of BHPP's appointment, subsequent developments in these cases suggest that it may have created an atmosphere of hostility between the Committee and the Debtors that ultimately led to another member of the Committee, namely, Avnet Inc., moving on two occasions for an order removing Spelfogel and Nixon as Committee counsel, in response to a lawsuit commenced in the New York State Supreme Court, Broome County, by American Manufacturing Services ("AMS"), a non-debtor affiliate of the Debtors, against the Committee, as well as its individual members, alleging serious transgressions by Spelfogel and Nixon in their representation of the Committee. In addition, the Court notes the extremely litigious nature of the adversary proceeding (Adv.Pro.02–80095) commenced by the Committee against the Debtors, AMS and others in April 2002, which defied resolution by way of extensive mediation instituted in January of 2005 but was ultimately settled by an Order, dated September 28, 2006, only six months after Nixon voluntarily withdrew from its representation of the Committee and Bond was substituted as its counsel. While the Court cannot speculate on the reasons for the sheer length of the adversary proceeding and the often acrimonious relationship between the attorneys involved, it does find significance in the relative ease with which the litigation was resolved after the Nixon firm and Spelfogel exited. Had a more detailed disclosure of Spelfogel's relationship to Jaco been made in the Terenzi Affidavit in 2002, rather than some three years later, the Court may have been reluctant to appoint BHPP in order to avoid the very dilemma that subsequently developed. Indeed, that is precisely why Fed.R.Bankr.P. 2014 must be construed broadly and objectively.

BHPP is quick to point out that Code § 1103, which governs the appointment of an attorney as counsel to a committee, is less stringent than Code § 327, which governs the appointment of professionals to represent the trustee or debtor-in-possession on behalf of the estate. Once again,

however, BHPP is focusing its attention on the issue of conflict of interest, whereas Fed.R.Bankr.P.2014 focuses on disclosure.

BHPP also contends that while Fed. R.Bankr.P.2014 has been carried to untenable extremes by some courts, most notably by U.S. Bankruptcy Court for the District of Vermont in *Fibermark*, even those courts backed off when it came time to impose any significant sanctions on the targeted professionals.

In *Fibermark* the UST argued that the obligation to disclose "all connections" encompassed "an obligation on the part of the professional to disclose all cases in which it was involved, regardless of whether there was any pecuniary or attorney-client or adversarial relationship." *Fibermark*, 2006 WL 723495 at *7. The court ultimately found that the professionals were not on notice that "failure to comply with this very high level of disclosure could result in sanctions." *Id.* at *11. Accordingly, the court declined to impose sanctions "for a rule violation against a party who did not have notice of the rule's requirements. Sanctions imposed by that sort of ambush serve no legitimate purpose." *Id.* The court declined to *drastically* reduce the professional's fees as requested by the UST and deferred making a final determination concerning fees until it had an opportunity to consider all the evidence.

While BHPP may be generally correct in its analysis, the Court believes that each case must be judged on its own facts. As concluded by the court in *Fibermark*,

the extent and format of such disclosures may vary from case to case, as the circumstances of each case will define the "connections" that must be disclosed to provide the Court and parties in interest with sufficient information to determine whether the applicant is disinterested. Moreover, any determination of the sufficiency of the disclosures produced pursuant to Rule 2014 should be made by balancing the plain language of the rule's mandate that applicants disclose "all connections," in order to maintain integrity of the professional appointment process in bankruptcy cases, against the common sense analysis of what connections are reasonably defined as pertinent to the ultimate question of disinterestedness, so that competent professionals do not find the requirements of representing parties in bankruptcy cases so burdensome as to deter them from doing so.

*Id.*

■ A review of all of the facts presented in this contested matter leads the Court to the conclusion that the disclosure made in the Terenzi Affidavit in 2002 regarding Spelfogel's relationship to Jaco appears to have been purposefully vague. The Court reaches that conclusion based on the significance of the roles taken on in the cases by both Spelfogel and Jaco, roles that had to have been known, or at the very least anticipated, by BHPP. It freely admits that it was Jaco that introduced BHPP to "the creditor group in the case." *See* Terenzi Affidavit, sworn to on July 25, 2007, at ¶ 6. Jaco was one of the original petitioning creditors that forced the Debtors into bankruptcy. Spelfogel was the son-in-law of the CEO of Jaco. Spelfogel apparently specialized in bankruptcy matters, as evidenced by the significant amount of time he devoted to these Chapter 11 cases. As reflected in BHPP's Fee Application, Spelfogel expended some 704 hours during the period March through December 2002. During the same period, Terenzi, though asserting he was the lead attorney on behalf of the Committee, consumed some 300 hours less. While it is possible that at the outset it was not envisioned that Spelfogel would play such a prominent role in the

representation of the Committee, such a possibility would seem to stretch credulity.

 Professional retention "must be free of any personal interests or connections that are at odds with the interests of the entities they intend to represent." *In re National Liquidators, Inc.*, 171 B.R. 819, 826 (Bankr.S.D.Ohio 1994), *aff'd in part, rev'd in part*, 182 B.R. 186 (S.D.Ohio 1995); *Leslie Fay Companies*, 175 B.R. at 533; *see also In re Codesco, Inc.*, 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982) (noting that a " 'disinterested' person should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters"). It is the opinion of this Court that whether the reference to Spelfogel's personal relationship to an officer of Jaco in the Terenzi Affidavit was at best a careless disregard for the mandate of Fed.R.Bankr.P.2014 or, at worst, an intentional effort to frustrate that mandate, the appropriate remedy is fee disallowance. *See EWC, Inc.*, 138 B.R. at 281; *see also In re Kings River Resorts, Inc.*, 342 B.R. 76, 86 (Bankr.E.D.Cal.2006) (pointing out that if a lack of disclosure is discovered after employment has been approved, the appropriate remedy is denial and disgorgement of compensation). The Court notes that in its Fee Order, it directed a 30% holdback on fees and a 10% holdback on expenses. The Court does not suggest that it was somehow clairvoyant in crafting a holdback in October of 2003 when full disclosure of Spelfogel's relationship to Jaco did not occur until some two plus years later in December 2005, but the holdback does provide a vehicle whereby the Court will approve a final fee award to BHPP of one half of the fee holdback or $74,148, together with the entire balance of the expense holdback or $3,842.45. The balance of the fees requested by BHPP in its Fee Application is denied as a direct result of its failure to fully and fairly comply with the disclosure requirements of Fed.R.Bankr.P.2014. The Court will not consider any further fee applications by BHPP in connection with its representation of the Committee.

IT IS SO ORDERED.