**In re CONDOR SYSTEMS, INC., a California corporation; and CEI Systems, Inc., a Delaware corporation, Debtors.**

**Nos. 01–55472–JRG, 01–55473–JRG.**

United States Bankruptcy Court,
N.D. California.

Oct. 22, 2003.

Mark L. Pope, Office of the U.S. Trustee, San Jose, CA, John S. Wesolowski, Law Offices of Pillsbury Winthrop, Palo Alto, CA, U.S. Trustee.

Susan C. Alker, Law Offices of O'Melveny and Myers, Los Angeles, CA, Kathryn E. Barrett, Silicon Valley Law Group, San Jose, CA, Edward A. Broderick, Law Offices of Shlansky and Broderick, Brookline, MA, Sara L. Chenetz, Robinson, Diamant and Wolkowitz, Los Angeles, CA, Cynthia, Hastings, Janofsky and Walker, Los Angeles, CA, Patrick M. Costello, Bialson, Bergen and Schwab, Palo Alto, CA, Elizabeth K. Flaagan, Holme, Roberts and Owen, Denver, CO, Peter M. Gilhuly, Law Offices of Latham and Watkins, Los Angeles, CA, Irene M. Guimera, Law Offices of Guimera and Guimera, Manhattan Beach, CA, Virginia Turner Hess, Law Offices of Brooks and Hess, Francis J. Hughes, Miller, Morton, Caillat and Nevis, Stephen J. Kottmeier, Law Offices of Hopkins and Carley, San Jose, CA, Joel H. Levitin, Dechert Law Offices, New York City, David W. Lively, Olimpia, Whelan, Lively and Ryan, San Jose, CA, K. Keith McAllister, Law Offices of K. Keith McAllister, Tiburon, CA, Cathleen Cooper Moran, Moran Law Group, Inc., Mountain View, CA, Steven G. Polard, Law Offices of Perkins Coie, Santa Monica, CA, Charles P. Schulman, Law Offices of Sachnoff and Weaver, Chicago, IL, Wendy W. Smith, Law Offices of Binder and Malter, Santa Clara, CA, Michael St. James, St. James Law, San Francisco, CA, Rodney M. Sweet, Law Offices of Sweet and Kleinman, Lafayette, CA, Mark T. Young, Law Offices of Mark T. Young, Encino, CA, for creditors.

Eric E. Sagerman, Law Offices of Winston and Strawn, Los Angeles, CA, for debtors.

## ORDER ON CONTESTED FEE APPLICATIONS OF NIGHTINGALE & ASSOCIATES

JAMES R. GRUBE, Bankruptcy Judge.

## I. INTRODUCTION

Condor is part of the electronic warfare industry. It is a provider of technologically advanced signal collection devices and specialized electronic countermeasure products.

As it approached bankruptcy Condor sought the assistance of Nightingale & Associates. Acting as Condor's financial advisor, Nightingale assisted Condor in its preparation for the filing of its Chapter 11 petition and the preparation of the reorganization plan and disclosure statement that was filed with the petition. After the filing, Nightingale continued in its role of financial advisor assisting Condor in the prosecution of its reorganization plan.

The Court has before it three interim applications for compensation filed by Nightingale to which objections have been raised. Specifically, by an order filed May 14, 2002, Nightingale was awarded interim compensation in the amount of $265,991.25 together with reimbursement of expenses of $25,880.17. This application covered the period from November 29, 2001 through February 28, 2002. Subsequently Nightingale submitted a second application covering the period from March 1, 2002 through May 31, 2002. This application sought fees in the amount of $211,520.00 and reimbursement of expenses of $24,593.40. Lastly, an application covering the period June 1, 2002 through August 31, 2002, was filed seeking fees of $359,066.55 and reimbursement of expenses of $49,352.97.

Thus, the fee requests the Court has been asked to review amount to $836,577.80.

Objections were filed by the Official Creditors' Committee and the United States Trustee. Hearings were held on these applications on April 24, 2002, August 14, 2002 and September 24, 2002, at which time the objections were argued.[1] Subsequently, written recommendations were filed regarding the applications by both the Committee and the United States Trustee.

For the reasons hereafter stated the objections of the Committee and United States Trustee are sustained and sanctions are imposed on Nightingale for its failure to disclose its connections as required by Rule 2014(a).[2]

## II. FACTUAL BACKGROUND

At the heart of the objections raised by the Committee and the United States Trustee is the allegation that Nightingale failed to disclose certain connections between it and Condor's majority shareholder, the majority shareholder's representative in the Chapter 11 case, as well as the majority shareholders parent company.

To understand and evaluate the objections, an understanding of Condor's ownership, debt structure and slide into bankruptcy is essential. Similarly, the role Nightingale played pre-petition in helping Condor prepare for the filing as well as its post-petition involvement must be examined in light of Condor's reorganization goals. Lastly, the undisclosed connections

complained of by the Committee and Trustee must be evaluated in light of the goal which the plan sought to achieve and the manner in which it was prosecuted.

### A. Ownership And Control Of Condor.

The principal owners of Condor are DLJ Merchant Banking Partners II, LP and its affiliated partnerships (DLJ), and Behrman Capital II L.P. and Strategic Entrepreneur (Behrman). DLJ was the principal shareholder of Condor owning in excess of 50% of its stock and together with Behrman owned 82.4% of the stock. DLJ was a subsidiary of Credit Suisse First Boston (CSFB). With respect to Condor, DLJ's principal representative is Kirk Wortman (Wortman).

Condor's financial problems appear to precede the filing by at least four years. Four years prior to bankruptcy, in December 1998, Condor entered into a transaction with DLJ, Behrman and Global Technology Partners LLC (GTP) to recapitalize Condor through a merger. In connection with the recapitalization Condor issued $100 million of senior subordinated notes (SDN). These notes represent a substantial majority of Condor's present unsecured debt, and debt which Condor's plan sought to eliminate in its entirety.

After the merger DLJ and Behrman held 82.4% of Condor's stock. DLJ could not hold voting stock in Condor under Department of Defense regulations because it had certain foreign ownership in-

---

1. The Court offered the parties an evidentiary hearing regarding the applications and objections. The offer was declined.

2. Shortly after the applications were submitted for decision, mediation began between the Creditors' Committee and Condor's directors and controlling shareholders whom the Committee had sued. A settlement was reached with the DLJ parties after months of negotia-

tions. During this time the Court withheld this decision so as not to influence the negotiations. The settlement was heard and approved on October 2, 2003. A condition to the settlement is that the order approving it becomes final. The Court waited for the order to become final before releasing this decision.

terests. Due to DLJ's situation, in April 1999, Condor and all its post-merger shareholders entered into an Investors' Agreement which provided that the GTP members holding the largest block of voting stock were entitled to nominate three of the five Condor directors. The other two Condor directors were the chief executive officer and Behrman's nominee. The Investors' Agreement also provided that if at any time the holder of the Class C common stock, DLJ, owned the same number of shares of Class A common stock, the GTP members' right to nominate the three Condor directors became the right of DLJ.

Interestingly, under the Investors' Agreement the Board was not authorized to take significant actions without DLJ's prior written approval. Such actions included the sale or disposal of all or substantially all assets, entering into mergers, consolidations or reorganizations, encumbering or mortgaging assets other than for working capital, issuing or redeeming debt or equity securities, dissolving Condor, and certain changes to the salary and bonuses of senior management.

Following the merger, on May 20, 1999, Condor filed "Amendment No. 3" to its S–1 with the Securities and Exchange Commission. It stated that its voting structure changed according to the Investors' Agreement and "[t]hat the governance and voting rights were established to facilitate governance rights for DLJ since they cannot directly hold voting stock in Condor due to certain foreign ownership interests." It appears that Condor was controlled by DLJ and Behrman and perhaps principally by DLJ and its representative, Wortman.

## B. Condor's Continuing Financial Decline.

According to the Creditors' Committee, at all times after the merger, Condor was insolvent and the financial condition of Condor steadily deteriorated. Within six months after recapitalizing, Condor was in financial difficulty.

A November 16, 1999 memo from Wortman outlined a number of adverse developments. Wortman concluded that they should attempt to sell the company. Condor would not meet its original 1999 or 2000 financial goals, it was struggling with software development issues and DLJ had reached the conclusion that the current CEO of the company needed to be replaced. Wortman also indicated Condor would not be covenant compliant with its lenders as of December 31, 1999, and the company's senior lenders were requesting a $12 million equity infusion.

According to the Committee, the financial situation of the company never improved. For fiscal 1999, operating income fell over 90% from $11.7 million to $1.0 million, and net income fell from $2.6 million to negative $13 million during the same period.

Less that a year after the recapitalization, on February 9, 2000, Condor entered into a subscription agreement with DLJ and Behrman for the purchase of $10 million of Series Al Preferred Stock. This stock was purchased by DLJ and Behrman on a pro rata basis with their common stock holdings. According to the Debtors' First Amended Disclosure Statement, the proceeds from the sale of $10 million in preferred stock were used to pay down revolving credit obligations under a credit agreement with the company's lenders and to fund two acquisitions. Eight months after the infusion of this $10 million Condor was again in trouble. A December 4, 2000, e-mail from CEO and Director Kent Hutchinson to another board member stated that he would be speaking with Wortman about "cash flow problems." At the

January 2001 Board Meeting, Hutchinson reported to the Board that "continued covenant compliance and operations requires an equity capital infusion." Hutchinson recommended $15 million in new equity be invested.

According to the Committee, although Board meetings were held virtually every month since early 1999, no Board meetings were held in March or April 2001. Without a meeting, on or about April 12, 2001, the Board approved the issuance of $10 million in senior discount notes (SDNs), funded by DLJ and Behrman. The SDNs purportedly resulted in the subordination of the $100 million in Discount Notes which had been issued in 1999.

On June 30, 2001, Condor's 10Q set forth:

| | | |
|---|---|---|
| Senior Secured Debt | | 18.9 |
| (Bank of America) | | |
| (Plus Letter/Credit 31M) | | |
| Senior Discount Notes | | 10.3 |
| (DLJ & Behrman) | | |
| Subordinated Notes | 100.0 | |
| Accounts Payable | | 8.8 |
| Accrued Expenses | | 14.8 |
| Customer Contract Advances | | 4.0 |
| | Total | 156.8 |

Less than seven months after DLJ and Behrman infused $10 million and purportedly took a senior creditor position, Condor filed its Chapter 11 petition.

## C. Condor's Chapter 11 Filing And Plan Of Reorganization—November 8, 2001.

Condor filed its Chapter 11 petition on November 8, 2001. With the petition it filed a plan of reorganization and disclosure statement.

The plan was fairly simple in structure. The secured loans with Bank of America, the company's senior lender, would be restructured. Assuming this could be accomplished, there would be covenant compliance but no overall improvement in the financial condition of Condor. Trade creditors would be paid in full over two years

following confirmation and customer obligations would be honored. These obligations approximated $12.8 million and were insignificant when compared to the company's total unsecured debt and apparent financial problems.

In Condor's view, the revitalization of the company must be achieved by the elimination of the $100 million Subordinated Notes issued in 1999 in connection with the recapitalization. Accomplishing this goal would immediately improve the liability side of Condor's balance sheet from $156.8 million to $56.8 million.

However, it was quite unlikely that the Subordinated Note holders would consent to being wiped out. The ability to cram the plan down over their objection was therefore necessary. The absolute priority rule set forth in § 1129(b)(2)(B) of the Bankruptcy Code requires that after a cram down no holder of a junior interest can retain that interest.

To deal with the absolute priority rule problem, the plan provided that all of the stock of Condor would be cancelled. Cancellation of the stock would, of course, result in DLJ and Behrman losing their 82.4% interest in the company. To solve this problem the plan provided that the $10 million SDNs held by DLJ and Behrman, issued just seven months before the filing, would also be cancelled. In return for this cancellation DLJ and Behrman would receive 90% of the new stock. The holders of the $100 million Subordinated Notes would receive no new stock but would be given warrants which would allow them to purchase the remaining 10% of the new stock for $11 per share.

As the parties declined the offer of an evidentiary hearing regarding the underlying facts, the Court is left with the inferences that can be drawn from the facts presented. It is hard to ignore the obvious. If Condor's plan was confirmed, the practical result was that the company re-

duced its unsecured debt by over 75% and DLJ and Behrman increase their owner-ship position from 82.4% to 90%.

The keystone of this plan was Nightin-gale. According to the Committee, Nigh-tingale was engaged by Condor on July 26, 2001, a little over three months before the filing. Among its responsibilities, and per-haps its principal responsibility, was valu-ing Condor. Prior to filing Nightingale concluded that the company had an inter-nal reorganization value of $51.5 million as a stand-alone business, with a range of value from $45.9 million to $61.2 million.

The Nightingale valuation fit nicely into Condor's plan. With the bank debt includ-ing the obligations on the letters of credit approximating $49.9 million, according to Condor, and payables and customer obli-gations totaling $12.8 million, there was simply no value left for the $100 million Subordinated Notes issued in 1999. For its three months of service prior to the filing Nightingale was paid $625,232.14.[3]

### D. Condor's Race To Confirmation—November 8 to December 20, 2001.

This was not a pre-packaged Chapter 11 plan. As far as the Court is aware there was little, if any, negotiation with creditors prior to filing. Nevertheless, Condor con-sidered this a fast track case and wanted to confirm quickly. Toward this end Con-dor requested an immediate hearing on its disclosure statement. Condor argued that since its business involved the Department of Defense and its requirements and regu-lations, it was imperative that the company conclude it reorganization as soon as possi-ble or its survival would be in jeopardy.

The Court held a hearing on Condor's motion to set the disclosure statement hearing on November 14, 2001, six days after the filing. The disclosure statement hearing was set for December 20, 2001.[4] Condor hoped to confirm its plan shortly thereafter. According to the Committee, Condor publicly announced that it would emerge from bankruptcy in the second quarter of 2002 as an operating company.

As the December 20 disclosure state-ment hearing approached three separate but related actions begin to take place although two of them were not known at that time.

1. The first involved Condor's contin-ued attempt to confirm its plan based on Nightingale's $50 million valuation despite information that seriously questioned Nightingale's valuation.

2. The second involved an unsolicited prospective purchaser, EDO Corpo-ration, for all of Condor's assets. The Committee was unaware of EDO's interest until EDO sought the Committee's assistance.

3. The third involved new contacts and connections between Nightingale, Wortman, DLJ and its parent CSFB which raised additional questions about Nightingale's valuation. None of the contacts were disclosed until the Committee learned some of the facts on June 28, 2002.

### E. The Creditors' Committee Learns Condor May Be Worth $90–95 Million And Slows The Confirma-tion Process—December 20, 2001 Through March 15, 2002.

A Creditors' Committee was appointed on November 19, 2001, a few days after

---

3. To the Court's knowledge no examination of these fees has been conducted by the Credi-tors' Committee.

4. In the Court's view this was a very early setting in a case of this size and complexity given the fact that there had been no apparent negotiations with creditor groups.

the Court set the disclosure statement hearing. Surprisingly, DLJ was a member of the Committee as was another entity of DLJ's parent company, Credit Suisse Asset Management. More surprisingly, Wortman was DLJ's representative on the Committee. It will later be discovered that Wortman was also attending Condor's Board Meetings.

On November 28, the Committee met for the first time and retained counsel. A few days later, December 7, the Committee retained its own financial advisors, CIBC World Markets Corporation (CIBC).

The Committee commenced a vigorous investigation into the affairs of Condor prior to the filing and into its present financial condition. This investigation caused the hearing on Condor's disclosure statement to be continued from the original date, December 20 to January 24, 2002, then February 12, and thereafter to March 21, 2002. Prior to this latter hearing, the Committee filed substantial objections to the plan and disclosure statement.[5]

The Committee's objections did not cause Condor to reassess its position. It pressed forward as if nothing had happened. At Condor's request further hearings were set on the disclosure statement on March 29, then April 10, April 23, and April 24, 2002.

In a related development, in late February the Committee received a valuation of Condor from its financial advisors. CIBC valued the company at $90–95 million as opposed to Nightingale's $50 million. This immediately brought into question the Nightingale valuation upon which Condor's cram down plan was based. This develop-ment, however, did not cause Condor to reassess its position or Nightingale to change its valuation. Condor continued to press forward with its disclosure statement indicating that it would find a place to mention CIBC's valuation.

It is interesting to note that when the Court became aware of the valuation gap it suggested that an early valuation hearing might save all involved considerable time and money. Condor rejected the idea and insisted that it wanted to try to quickly get to confirmation with its $50 million cram down plan. As set forth above Condor sought further hearings on its disclosure statement until April 24, 2002, by which time procedures for the sale of the Company to EDO were being discussed.

### F. The Unwanted Suitor—The Sale of Condor—December 2001 to April 24, 2002.

While Condor continued to push forward, there was yet another development that called the Nightingale valuation into question. Sometime in December or very early January Condor was contacted by EDO Corporation which expressed an interest in acquiring the company's assets.

On January 10, 2002, a meeting was held in New York at which EDO indicated an interest in acquiring Condor's assets. According to the Committee the price discussed was in excess of Nightingale's valuation. This appears true in light of the final purchase price. This discussion did not cause Nightingale to reassess its opinion of value or Condor to reassess its course of action.

The Committee was not informed of these developments by Condor.[6] Nor was

---

**5.** After reviewing the objections it appeared to the Court that Condor's attempt to confirm quickly had stalled. The objections are summarized in the ORDER ON CONTESTED FEE APPLICATIONS OF MURPHY, SHENE-MAN, JULIAN & RODGERS filed concurrently with this order.

**6.** See Declaration of Sarah L. Chenetz in Support of Reply of Official Committee of Unse-

the Committee informed by Wortman who attended nearly all of the weekly Committee meetings during this time.[7] Although Wortman is DLJ's representative on the Committee he also attended Condor's Board meetings on behalf of DLJ, a fact the Committee did not learn until the Summer of 2002.

At some point in January 2002, EDO decided to communicate directly with the Committee. Committee counsel described the contact as follows:

> Committee counsel receives call from EDO's counsel indicating that EDO may be interested in asset acquisition, and that Debtors are not cooperating with their requests for information. Committee's professionals ask Debtors' professionals about this and Debtors' general interest in asset sale. Responses from Debtors' professionals are vague regarding specifics, indicate are not seriously interested in sale to EDO and express limited interest in sale generally.[8]

The Committee inquires again in February about asset sales:

> Committee professionals again ask Debtors' professionals about inquiries and interest on asset sales. Responses reflect lack of interest described as "tire kicking" and seemingly lack of activity.[9]

Throughout February information about EDO's interest is not provided to the Committee by either Condor or Wortman.

The Committee, presumably with the exception of Wortman and the Credit Suisse Asset Management representative, contin-

ued in the dark through much of March. On March 21, 2002, there was another hearing on Condor's disclosure statement. EDO's counsel came into open court and stated that it was interested in acquiring the assets. Condor protested. The Court's impression of the remarks and interchange was that EDO was interested in buying but Condor was not interested in selling and therefore not cooperating.[10]

In the discussions that occurred on March 21, it was clear to the Court that Condor wanted to maintain complete control over any discussions with EDO and did not want the Committee or the company's lenders involved. The Committee had not been kept apprised of these developments and had apparently been misled. Bank of America, the senior secured creditor was in a similar position. Both wanted to participate in the discussions so as to protect their respective interests. After lengthy discussion, the Court fashioned a set of ground rules for the negotiations to go forward.

With the Committee and the Bank monitoring the negotiations, it did not take long to negotiate a sale. By the hearing on April 24, a month later, procedures for the sale of Condor's assets to EDO were being discussed. The EDO sale dealt Nightingale's valuation another telling blow. In its motion to sell the assets to EDO Condor stated that "the aggregate consideration payable by the Lead Bidder could total as much as $112 million." The sale was subsequently approved and consummated. Nightingale had so undervalued

cured Creditors to Pleadings Filed in Support of Applications of Nightingale & Associates, LLC and Murphy Sheneman Julian & Rogers, a Professional Corporation, filed October 29, 2002 [hereinafter Chenetz Declaration].

7. Chenetz Declaration.

8. Chenetz Declaration.

9. Chenetz Declaration.

10. Condor protested that there should have been no public disclosure by EDO but its interest would not have remained confidential for long as EDO had filed an 8K Statement with the SEC on March 20, 2002, announcing its offer to purchase.

Condor that it is difficult to understand how it happened.

### G. Nightingale's Exploration Of A New Venture.

The application to employ Nightingale as Condor's financial advisor was filed on November 21, 2001. It represented that Nightingale was a "disinterested person" as the term is defined in § 101(14) of the Bankruptcy Code. It also stated that Nightingale had no connection with creditors or any other party in interest. The application was supported by the declaration of Timothy Hassenger, a managing director of Nightingale. The declaration reiterated that Nightingale was disinterested and "did not have any connection as defined in Bankruptcy Rule 2014 with the Debtors or their affiliates, their creditors, or any other parties-in-interest, or their respective attorneys and accountants. . . ." [11]

In 1999, Nightingale had discussions with DLJ about its interest in investing in troubled companies.[12] There is no indications that those discussions bore fruit and the Court therefore assumes there were no connections to disclose at the time of the filing. However, it did not take long for significant connections to develop. While Condor kept pressing to confirm its plan based on Nightingale's $50 million valuation, and the EDO negotiations dragged on because of Condor's lack of interest, Nightingale was busy discussing a new venture with Wortman, DLJ and CSFB.

On December 26, 2001 and January 3, 2002, Howard Hoffmann and Michael R. D'Appolonia, two principals of Nightingale, had dinner meetings with Wortman. The involvement of D'Appolonia with Wortman is very significant in the context of Nightingale's questionable valuation. D'Appolonia was "the principal of Nightingale responsible for . . . [the Condor] engagement."[13] Wortman, of course, was on the Creditors' Committee representing DLJ, the major beneficiary of the company's reorganization plan, and at the same time attending Condor Board meetings. These meetings between Nightingale principals and Wortman were in preparation for an introductory meeting with CSFB regarding a business concept unrelated to Condor. These meetings were not disclosed to the Court.[14]

Two weeks later, January 17, there is an introductory meeting with CSFB attended by Hoffmann, D'Appolonia and Wortman. This also was not disclosed. A conference call between Hoffman, D'Appolonia and Wortman regarding a draft outline of a business plan took place on January 31, 2002. As a result of the call, refinements were added to the outline and it was forwarded to CSFB on February 1, 2002.[15] Approximately February 2, CSFB advised Hoffmann that it was not interested in the new proposal. Over the next three weeks Wortman and Nightingale continue to pursue the opportunity and search for financ-

---

11. See Declaration of Timothy Hassenger in Support of Application for Order of Employment of Nightingale & Associates LLC as Bankruptcy Consultants and Financial Advisors, filed November 21, 2001 [hereinafter Hassenger Declaration].

12. According to the Declaration of Michael D'Appolonia in Support of Second Interim Application of Nightingale and Associates LLC, filed September 10, 2002, discussions did not proceed beyond "conceptual discus-

sions" because DLJ soon became engaged in acquisition negotiations with CSFB.

13. Hassenger Declaration.

14. Chenetz Declaration.

15. Declaration of Howard Hoffmann in Support of Second Interim Application of Nightingale & Associates, LLC, filed September 10, 2002 [hereinafter Hoffmann declaration].

ing. During March 2002, two meetings were held by Nightingale's Hoffmann and D'Appolonia, together with Wortman,[16] with representatives of a possible source of financing. By April 6, 2002, a term sheet was being circulated which is agreed upon on May 28, 2002 and followed by an agreement which is reached on June 13, 2002.[17] D'Appolonia and Wortman are now in business together although no one knows.

From the time of the first disclosure statement hearing in December 2001, until the sale to EDO became a reality, the end of April 2002, the Committee continually battled Condor's drive to confirm its plan based on Nightingale's valuation. The Committee questioned, and then challenged, the valuation but was forced to do so without being aware of the ongoing relationship between Nightingale, CSFB, DLJ and particularly Wortman who sat on the Committee and who also advised Condor's board of directors.[18]

## III. THE OBJECTIONS

The United States Trustee's objection focuses on Nightingale's failure to disclose it connections with Wortman, DLJ and CSFB as required by Federal Rule of Bankruptcy Procedure 2014(a). The Trustee points to the critical role Nightingale had in supporting Condor's plan and that confirmation would eliminate $110 million of debt while increasing DLJ's and Behrman's control over the company. Nightingale would provide critical testimony in connection with confirmation and in this context the Nightingale connections with Wortman, DLJ and CSFB were extremely important.

The Trustee points out that Nightingale had been trying for ten years to develop a business of investing in troubled companies. Was Wortman, DLJ or Credit Suisse the one who could help Nightingale achieve that goal? The Trustee states:

> Even an impartial observer could wonder whether under those circumstances Nightingale had only the best interest of the estate in mind or whether it might act in a way to keep Mr. Wortman happy during the chapter 11 proceeding.

Nightingale's connections were not insignificant. During its representation of the debtors, principals of Nightingale agreed to terms of a business relationship with Wortman and others.

Nightingale never filed any papers with the court disclosing any of these connections until September 2002. Because disclosure was not immediate and the circumstances so significant the Trustee believes the penalty should be severe. The Trustee recommends that Nightingale be denied all compensation after December 26, 2001, the first documented date Nightingale met with Wortman to discuss the new venture. Thus, the Trustee recommends that Nightingale be denied:

1. The fees incurred after December 26, 2001 in the first interim application, which are approximately $145,-616.25 [19];

---

16. During this time Wortman ceased employment at Credit Suisse; however, he remained DLJ's representative in the bankruptcy.

17. Hoffmann Declaration; Chenetz Declaration.

18. Wortman was finally removed from the Creditors' Committee when it was reconstituted by the United States Trustee on October 4, 2002.

19. During this period the First Interim Fee Application from Nightingale shows D'Appolonia billed for 2.7 hours on December 27, 2001, amounting to $1,350. Hassenger billed 10 hours for the period December 23, 2001—December 29, 2001, amounting to $3,750. Hassenger's time sheets do not include itemization of fees incurred between these dates. The Court added to this $5,100 the amount of

2. $211,520.00 in fees and $24,593.40 in expenses requested in the second interim application;

3. $359,066.55 in fees and $49,352.97 in expenses requested in the third interim application.[20]

The denial of compensation recommended by the Trustee amounts to $790,149.17.

The objection of the Official Creditors' Committee expressed similar concern over Nightingale's disclosure failures. In its recommendations the Committee points out that "the interests of CSFB/DLJ have been diametrically opposed to that of other unsecured creditors." With respect to Nightingale's conduct the Committee states:

> The most disturbing aspects of the Nightingale/CSFB/DLJ relationship only recently have come to light. It was only after reading the declarations submitted by Nightingale, in September 2002, in response to the Committee's Comments that the Committee learned that as early as December 2001 the principals of Nightingale [have] been in serious discussions with CSFB regarding joint establishment of an investment fund. The Committee is informed and believes that after serious discussion, which included exchange of a term sheet, CSFB declined to proceed, but that Wortman, in his individual capacity, has undertaken such a venture with Nightingale. *See* Hoffmann Dec. ¶ 6, *et seq.*
>
> In light of the strict disclosure requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, described below, it is reasonable to expect

fees from January 3, 2002—February 28, 2002.

**20.** When Nightingale's Third Interim Application was filed the United State Trustee filed a similar objection urging the denial of all re-

that all connections between Nightingale or its principals on one side, and CSFB/DLJ or its representatives on the other, would have been—*should have been*—contemporaneously disclosed by Nightingale, a self-described financial advisory firm which for more than 25 years has specialized in representing parties in bankruptcy cases. *See* Hoffmann Dec. ¶ 4. Indeed, creditors, the Court and the United States Trustee had a right to know *contemporaneously* that Nightingale's principals approached a party asserting senior claims of approximately $6.8 million in this bankruptcy case for the purpose of soliciting that creditor to become an equity investor in an investment fund which Nightingale principals had long been unsuccessfully seeking to establish, and further, that the contact continued for more than a month and actually proceeded as far as the preparation of a business plan (late December 2001 through early February 2002). *See* Hoffmann Dec. ¶ s 7–10.

Furthermore, the failing was only made worse when, CSFB/DLJ having ended their discussion about becoming Nightingale's long sought after funding source, Wortman, while still representing DLJ on the Committee, and attending board meetings on behalf of DLJ, began having discussions with Nightingale principals about personally going into business with them (February–May 2002). *See* Hoffmann Dec. ¶ s 11–17. The failure to disclose continued once Wortman and Nightingale principals reached an agreement on how to proceed with their new business and began to conduct business (May 2002). The

quested fees and expenses. It is also noted that the Trustee objected to Nightingale's low valuation of Condor but left any recommendation regarding this issue to the Creditors' Committee.

Committee appropriately would have wanted to know about these events as they were occurring. And when more formal agreement between the Committee member, Wortman, and the principals of the Debtors' financial advisors were drafted (June–September 2002), that information should also have been disclosed to the Committee. *See* Hoffmann Dec. ¶s 18–20.[21]

The Committee, like the Trustee, wonders about whether Nightingale was discharging its responsibilities in an even-handed manner.

Like the Trustee, the Committee believes the penalty must be severe for such a significant failure to disclose. The Committee recommends that all fees and expenses after January 3, 2002 should be disallowed. The Committee's analysis leads to a request that the following be denied:

1. $346,186.25 in fees and $38,159.13 in expenses for the period January 3, 2002—May 31,2002;

2. $359,066.55 in fees and $49,352.97 in expenses requested in the third interim application covering the period June 1, 2002—August 31, 2002.[22]

Thus, the Committee believes that a total of $792,764.90 in compensation should be denied.

There is a second prong to the Committee's objection. The Committee believes that the "Nightingale valuation is inherently flawed in the methodologies selected and the conclusions reached."[23] The inaccuracy of the valuation is underscored by the sale to EDO. The Committee then goes on the state:

> Whether this is the result of design, inability or both, the remedy is the same. Nightingale should not be paid for the heavy cost the estates have borne in connection with the valuation since, to be allowed fees, the services rendered must benefit the estate.[24]

The Committee proceeded to estimate the unnecessary fees it believed were incurred because of Nightingale's valuation. During the period of November 29, 2001 through May 31, 2002, the Committee incurred $105,980.00 in fees relating to the plan and disclosure statement. During the same time frame Condor's counsel incurred $214,029.50.

> It is not possible to determine the precise amount of counsel fees which could have been avoided if the Nightingale valuation had been properly completed. Yet, under the circumstances of these cases, at a minimum, it is likely that if the initial plan and subsequent dual track plan were not premised as they were on Nightingale's incorrect valuation, the fees of Committee and Debtors' counsel expended on the plan and disclosure statement would have been at least 25% less than they were through May 31, 2002.[25]

Based on this approach the Committee recommends that Nightingale's compensation be reduced an additional $80,002.13.

---

**21.** Recommendations of Official Committee of Unsecured Creditors filed October 15, 2002 (footnotes omitted) [hereinafter Recommendations of Committee].

**22.** At the time the Committee filed its recommendations, it was unaware of any monthly fee statement from Nightingale for August 2002, but it requested that all fees since January 3, 2002 be denied. The Court has taken the August 2002 fees into account as part of the Committee's request.

**23.** Recommendations of Committee.

**24.** Recommendations of Committee.

**25.** Recommendations of Committee.

The Committee lastly believes that Nightingale's inaccurate valuation caused the Committee and its professionals to become more involved in the sale process than would have otherwise been necessary. The Committee again believes that 25% of its $108,681.25 in fees could have been saved and seeks a further reduction of $27,170.31.

## IV. DISCUSSION

### A. Rule 2014(a) Requires Disclosure Of Connections.

■ Federal Bankruptcy Rule 2014(a) requires that professionals employed by the estate disclose "all of the [applicant's] connections with the debtor, creditors, [or] any other party in interest ...." [26] Under 11 U.S.C. § 327(a), a professional employed by the bankruptcy estate must not hold or represent an interest adverse to the estate and must be "disinterested." [27] "Disinterested person" is defined to include a person that "does not have an

interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ...." 11 U.S.C. § 101(14)(E). It is the bankruptcy court who must ensure that parties employed under § 327(a) conduct themselves in the best interests of the bankruptcy estate. *In re Park–Helena Corp.*, 63 F.3d 877, 880 (9th Cir.1995) (citing *In re Lincoln N. Assocs., Ltd.*, 155 B.R. 804, 808 (Bankr.D.Mass.1993); *In re EWC, Inc.*, 138 B.R. 276, 280–81 (Bankr. W.D.Okla.1992)).

■ Rule 2014(a) is a means by which the court can comply with its responsibilities. "The disclosure rules impose upon [professionals] an independent responsibility. Thus, failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the [professional] had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *In re Park–*

---

**26.** Federal Bankruptcy Rule 2014(a) provides in relevant part:

> (a) **Application for and Order of Employment.** An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee. The application shall be filed, and, ..., a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the

United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**27.** Bankruptcy Code § 327(a) provides:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

Section 1107(a) makes § 327(a) applicable to professionals retained by a debtor in possession in a chapter 11 case.

70

*Helena Corp.*, 63 F.3d at 880 (citing *In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252 (9th Cir. BAP 1987)).

The requirement of disclosure is "applied literally, even if the results are sometimes harsh." *Id.* at 881. The disclosure requirements of Rule 2014 do not give the professional the right to withhold information because it is not apparent to the professional that a conflict exists. *Id.* In addition, the disclosure requirement is a continuing one, even after an application for employment is approved. *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y.1998) (citations omitted).

Nightingale first argues that neither the Trustee nor the Committee cite to a case analogous to the facts of this case. Nightingale asserts that the objectors have expanded the scope of "connections" to an unrelated business venture with no precedent support.[28]

However, whether or not "connections" exist and the sanctions for nondisclosure is a discretionary decision of the court. This court will not compare itself against the circumstances of other cases, but looks to the circumstances of this case in determining whether Rule 2014 was violated and if so, the appropriate sanction based on reasonable inferences from the facts presented.

While the term "connections" is not defined in Rule 2014(a), it has long been held to be read broadly. *See In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D.Okla.1992). In addition, strict compliance with the disclosure requirements, independent of a finding of any actual conflict, is required in order to give effect to the disinterestedness requirements of the Bankruptcy Code and maintain the integrity of the system. *Id.*

Nightingale goes on to argue that "Nightingale," as the person employed, was not involved in the business meetings; "rather, the meetings involved two principals of Nightingale who were discussing a *different* business from the financial consulting business in which Nightingale is

28. Nightingale's argument focuses in part on other courts' findings of disinterestedness as opposed to violation of the professional's duty to disclose under Rule 2014(a). For example, Nightingale relies on *In re CF Holding Corp.*, 164 B.R. 799 (Bankr.D.Conn.1994), to argue that the situation here is unlike that case because in *CF Holding Corporation* the financial advisor had taken a direct pecuniary interest adverse to the estate. The *CF Holding Corporation* court held the financial advisor became "not disinterested" and represented an adverse interest to the estate. *Id.* at 807. Considering 11 U.S.C. § 328(c), which vests the court with discretionary power to deny fees to a professional who comes into conflict with the estate, the court then denied the financial advisor all unpaid compensation and expenses in the amount of $795,484.59. *Id.*

However, in its discussion, the *CF Holding Corporation* court noted that in the Second Circuit a violation of the disclosure rule alone is sufficient to deny compensation regardless of whether the undisclosed connection was materially adverse to the estate. *Id.* at 806. The Ninth Circuit has acknowledged that the issues of whether the disclosure requirement was violated and whether the professional was disinterested are distinct questions and separately sanctionable. *See In re Park–Helena Corp.*, 63 F.3d 877, 880 (9th Cir.1995).

This Court declines to analyze Nightingale's status after the fact or to conclude that Nightingale was not disinterested or held an adverse interest to the estate. *See In re Combe Farms, Inc.*, 257 B.R. 48, 55 (Bankr.D.Idaho 2001). Both the Trustee and the Committee challenge Nightingale's fees based on the Rule 2014(a) violation. While this Court in retrospect can assume that disclosure of the connections at issue would have led to further inquiry by this Court and the objectors, *see id.*, the analysis here is limited to the Rule 2014 violation. In addition, the Court does not foresee any further work by Nightingale on behalf of the estate past the period of the Third Interim Application.

presently involved, with respect to matters wholly unrelated to this case." As a result, according to Nightingale, the business meetings that took place in December and January reflect no personal connections of Nightingale that must be disclosed.

With respect to the business relationship developing between Wortman and "certain principals of Nightingale," Nightingale argues that DLJ is not involved in the business venture and only Wortman and "certain principals of Nightingale" are pursuing the new independent business venture. Nightingale asserts that Rule 2014 does not include employees or principals of an employed professional in respect to a wholly unrelated business transaction with an employee of a creditor. By its argument, Nightingale has unilaterally determined that no connections worth disclosing exist under Rule 2014.

 However, "[t]he duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest .... [The professionals] cannot pick and choose which connections are irrelevant or trivial .... [N]o matter how trivial it appears, the professional seeking employment must disclose it." *In re Park–Helena*, 63 F.3d at 882 (quoting *In re EWC, Inc.*, 138 B.R. at 280–81). Nightingale has made the determination that there was no connection worth disclosing, and in doing so Nightingale has broken the "cardinal principle of Rule 2014(a) ... [, it] arrogated to [itself] a disclosure decision that the Court must make." *In re Granite Partners L.P.*, 219 B.R. at 45.

## B. An Obvious Connection To Be Disclosed By Nightingale Under Rule 2014 Exists.

 The connection here is more than just a business representative for DLJ and certain principals of Nightingale pursuing an independent business venture. Wortman, the "business representative for DLJ," represented DLJ on the Creditors' Committee while at the same time appearing at Board meetings of Condor in which DLJ held more than 50% of Condor stock. At the time that Wortman was pursuing his business venture with certain principals of Nightingale by soliciting CSFB and later alternative funding sources, a plan was being pursued in which DLJ and Behrman were to obtain a 90% stock ownership interest in Condor after wiping out $100 million in debt. The success of this plan was contingent on the valuation provided by Nightingale.

In early 2002, while Wortman and certain principals of Nightingale were pursuing this course, EDO's interest in purchasing Condor remained undisclosed to the Committee. EDO was offering to purchase Condor at a price in excess of Nightingale's valuation. In February 2002, the Committee received a written valuation report from Nightingale as requested and its valuation remained unchanged, despite Nightingale being aware of EDO's interest in acquiring Condor at a price in excess of Nightingale's valuation.

As for Nightingale's characterization that only "certain principals" of Nightingale were involved, it seeks to distance itself from this business venture by arguing that D'Appolonia, one of the principals of Nightingale who was involved in the Condor case and knowledgeable of the new business venture, only devoted 4.40 hours to the case during the relevant Second Interim Period. Nightingale argues that Timothy Hassenger had no knowledge whatsoever of any unrelated business discussion of certain principals and performed 99% of the work during this period.

However, D'Appolonia was "the principal of Nightingale responsible for ... [the

Condor] engagement," according to the declaration submitted with Nightingale's employment application. In addition, Hassenger's own billing records show that during this time Hassenger had numerous meetings and discussions with D'Appolonia as well as Wortman, who was identified on the billing records as "SDN holder" or "Senior Discount Note Holder." Discussions involved issues concerning the plan and disclosure statement. During this time period involving both the First and Second Interim Application, time records reflect Hassenger's continued work on revisions and updates to the valuation analysis, which remained unchanged, as well revisions to the plan and disclosure statement based on this unchanged valuation.

Despite Nightingale's argument that it, as the "person," had no involvement in the business plan, Hoffmann, a principal and managing partner at Nightingale stated:

> For approximately 10 years, the Principals of Nightingale have been considering a business concept that would entail utilizing its specialized skills to identify, acquire and rehabilitate financially distressed entities in situations where Nightingale is not acting in the role of an independent financial advisor. To pursue such a business endeavor, however, the Principals of Nightingale require the participation of a financial partner, such as an investment banking firm, venture capital fund or other investment fund, to supply the capital necessary to invest in or acquire a financially troubled business and support its turnaround. Over the years, the Principals of Nightingale have ap-

proached several sources of equity capital . . . . [29]

Hoffmann described attending these funding source meetings "on behalf of principals of Nightingale." The agreement negotiated with Wortman in the Spring of 2002 resulted in the formation of an entity called "Global Restructuring Partners, LLC." The owners would be a limited liability company controlled by Wortman and a limited liability company controlled by those principals of Nightingale who chose to participate. Nightingale would have no ownership interest in GRP, but would help identify opportunities, and would, on a fee basis, perform due diligence services for GRP and the Equity Participant in connection with investments to be made under the co-investment agreement, and provide management services as required.[30] Based on these representations, the Court concludes Nightingale was involved in this business venture and has a potential monetary interest to be gained from its success.

Nightingale attempts to argue that it has no actual or potential conflict of interest in this matter [31], but the issue before the court concerns the disclosure of connections. *See* Footnote 23, *supra.* The above describes more than a fleeting involvement among numerous individuals actively involved in this bankruptcy. Despite Nightingale's protests, these connections were extremely significant and were required to be disclosed under Rule 2014(a). The significance is obvious when Wortman and D'Appolonia's activities are examined in the context of Condor's plan and the Committee's opposition to it. Nightingale had significantly undervalued

---

29. Hoffmann Declaration.

30. Hoffmann Declaration.

31. The Court does not know whether or not Nightingale had a conflict of interest. The critical information did not come to light until after the sale to EDO by which time Nightingale's erroneous valuation had become moot. In addition, the objecting parties as well as Nightingale declined the Court's offer of an evidentiary hearing on the objections.

Condor and had the problem not been mooted by the EDO sale, the Committee would have wanted to explored every possible reason for the undervaluation including the relationship between Wortman and D'Appolonia.

### C. Sanctions Are Warranted For Failure To Disclose Under Rule 2014(a).

Nightingale next argues that even if it violated Rule 2014(a), a review of cases indicates that courts are typically measured in their response and seek not to provide a windfall to the estate. *In re Granite Partners, L.P.*, 219 B.R. at 41. It argues that its valuation determination was made in early November 2001, prior to the connections complained of. In addition, during the March through May 2002 period, the sale of Condor to EDO was center stage, and the fight over the valuation was rendered moot. Nightingale directs the Court to a review of the hours billed, which, according to Nightingale, demonstrates there was no injury or prejudice to the estate during these periods, and at best only D'Appolonia's fees of $2,200 during this period are implicated.

The Court notes that the fight over valuation was not rendered moot during this period but continued into May 2002. Nightingale's time records reflect that work involving valuation, the plan and the disclosure statement was continuing. As pointed out by the Committee, during this period the Committee incurred $105,980 in fees in connection with the plan and disclosure statement and Condors counsel billed $214,029.50. A substantial part of this work can be directly attributed to the undervaluation of the company.

In addition, Nightingale's argument that its valuation was complete prior to these business meetings and that it provided valuable service to the Debtor does not mitigate its failure to disclose. Disclosure violations may result in sanctions "regardless of actual harm to the estate." *In re Park–Helena*, 63 F.3d at 881 (quoting *In re Maui 14K*, 133 B.R. 657, 660 (Bankr.D.Hawai'i 1991)). "Violation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were *de minimis*." *In re EWC, Inc.*, 138 B.R. at 280.

As for the Third Interim Period, from June 2002 through August 2002, Nightingale argues that the closing of the sale and post-sale wind-up of the Debtor was the primary activity. In addition, by June 2002, the Committee was advised of the business relationship, but they never requested that Nightingale cease working.

However, Nightingale's duty to disclose under Rule 2014 is a duty owed to the Court, not the Committee. In addition, it is not the Committee's duty to make full disclosure. *See In re Roberts*, 46 B.R. 815, 839 (Bankr.D.Utah 1985), *rev'd in part on other grounds* 75 B.R. 402 (D.Utah 1987). A professional who neglects to make proper disclosure does so at his own peril. *In re Maui 14K Ltd.*, 133 B.R. at 660.

Denial of all of Nightingale's fees is within this court's discretion. *In re Park–Helena*, 63 F.3d at 882. This Court finds that Nightingale's failure to disclose its relationship under Rule 2014(a) is inexcusable. Nightingale represented to this Court that D'Appolonia is the principal of Nightingale responsible for the Condor engagement. This very person was actively involved in a business venture with Wortman, the representative of DLJ, which was the entity that sought a majority interest in Condor based on a plan

whose valuation was completed by Nightingale. Despite issues coming to light which raised concerns over the valuation, it remained unchanged during the First and Second Interim application period and plan confirmation continued to be pursued. The period over which this venture was developed involved a contentious period between the Committee, the Debtor, and the SDN holders over the direction of the case. Nightingale's connection to this business venture was more than just by way of certain principals' involvement. Nightingale has a pecuniary interest in the success of this venture to be gained from fees generated by due diligence services.

By failing to make this Rule 2014(a) disclosure, Nightingale deprived this court of its function to make a § 327(a) determination.[32] Given the circumstances of this case as described and to maintain the integrity of the bankruptcy system, the Court denies Nightingale's fees and expenses in the total amount of $510,367.65. This sanction reflects a reduction in the First Interim Fee Application for fees in the amount of $135,416.25 and expenses in the amount of $13,364.36 as reflected on Nightingale invoices for the period of January 3, 2002—February 28, 2002; a denial of all fees in the amount of $211,520.00 and expenses in the amount of $24,593.40 on the Second Interim Fee Application for March 1, 2002—May 31, 2002; and a denial of all D'Appolonia's fees and expenses on the Third Interim Fee Application in the amount of $4,211.14, plus a 30% sanction for the remaining fees and expenses in the Third Interim Fee Application in the total amount of $121,262.50.

The Court has considered the recommendations of the Trustee and Committee requesting a total denial of fees and expenses in the Third Interim Fee Application. Denial of all fees and expenses from January 3, 2002 through May 31, 2002 is appropriate considering the role the valuation of Condor played during this period. However during the Third Interim period much of Nightingale's fees and expenses were related to the sale and wind up of Condor. A windfall to the estate and Committee for Nightingale's assistance during the Third Interim period is not warranted. However, Nightingale's failure to disclose under Rule 2014(a) is serious and in light of this failure, the Court believes the sanction for the Third Interim period is appropriate. Any fees paid to Nightingale in excess of the fees and expenses allowed must be disgorged.[33]

---

32. "Although the remedies are similar, violation of the disclosure rules and violation of the disinterestedness requirements are independent." *In re EWC, Inc.*, 138 B.R. at 281. As stated, Nightingale's discussion on the imposition of sanctions focuses in part on case discussions concerned with whether a professional is not disinterested as required by § 327 and the appropriate remedies if such a finding is made. *See* Footnote 23, *supra*. As pointed out in *In re EWC, Inc.*, 138 B.R. at 282, a consequence of a professional who originally is disinterested and later comes into a subsequent conflict is addressed in § 328(c), which allows the court discretion to deny compensation. According to *In re EWC*, some courts have fashioned a remedy in such a circumstance to "penalize" the person violating the disclosure and disinterested requirements by partially denying the requested compensation under § 328(c). *Id. In re EWC* also discussed that another alternative was to allow such compensation under § 503(b)(1)(A) or § 506(c) as an administrative expense provided the standard of proof for such a claim is met. *Id.* at 283. For a discussion on the distinction between sanctions for failure to disclose and for the consequences of a professional that has a conflict of interest during employment, see *id.* at 280–83.

33. Because of the amount of fees and expenses denied in connection to Nightingale's failure to disclose, the Court is not going to address the Committee's objection with respect to undervaluation although the Court believes there is some merit to the objection. Given the CIBC valuation and the price that

## V. CONCLUSION

The Court finds that notice of the applications was sufficient and that all parties in interest have had a sufficient opportunity to be heard.

The Court hereby sustains the objection of the United States Trustee and the Creditors' Committee.

EDO paid for Condor's assets, a logical question is how did Nightingale miss the valuation by at least $40 million?